In re CHICAGO, M., ST. P. & P. R. CO.

CHICAGO, M., ST. P. & P. R. CO. v. GROUP
OF INSTITUTIONAL INVESTORS et al.,
and nine other cases.

Nos. 7590, 7610–7617, 7686.

Circuit Court of Appeals, Seventh Circuit.

Dec. 4, 1941.

As Modified Jan. 12, 1942.

F. C. Nicodemus, Jr., and A. Perry Osborn, both of New York City, Henry A. Gardner and Helen W. Munsert, both of Chicago, Ill., Robert H. McRoberts, of St. Louis, Mo., Walter S. Underwood, Wendell J. Brown, Meyer Abrams, Edward R. Johnston, and Albert K. Orschel, all of Chicago, Ill., Edwin S. S. Sunderland and T. O'G. FitzGibbon, both of New York City, Henry F. Tenney, Roger R. Leech, Roy O. West, Wm. A. McSwain, Wm. H. King, Jr., Wm. S. Warfield, III, Wm. F. Peter, Frederic Burnham, Irving Goldsmith, Donald M. Graham, E. S. Ballard, Minier Sargent, Frederick Secord, and John H. Boord, all of Chicago, Ill., Robert V. Massey, Jr., of Philadelphia, Pa., Joseph E. Nolan, of Chicago, Ill., Reese D. Alsop, of New York City, Wm. B. Hale and Sidney K. Jackson, both of Chicago, Ill., W. A. W. Stewart, McCready Sykes, Frederick J. Moses, and Guido Pantaleoni, all of New York City, and Malcolm Mecartney, of Chicago, Ill., for appellants.

Lee Walker, of Chicago, Ill., Cassius M. Clay, of Washington, D. C., Kenneth F. Burgess, Douglas F. Smith, Geo. Ragland, Jr., and Walter H. Jacobs, all of Chicago, Ill., Sanford H. E. Freund, of New York City, Anthony Michel, Irving Herriott, A. J. Pflaum, and Cobert EtsHokin, all of Chicago, Ill., Boykin C. Wright, and Robert M. Becket, both of New York City, Jesse L. Cook, of Chicago, Ill., Julius Weiss, John B. Marsh, and Edward E. Watts, Jr., all of New York City, A. N. Whitlock, C. S. Jefferson, and M. L. Bluhm, all of Chicago, Ill., Fred N. Oliver, Willard P. Scott, and George J. Miller, all of New York City, and Daniel Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for appellees.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

These numerous appeals, save one, present attacks on a proposed plan of reorganization of the Chicago, Milwaukee, St. Paul and Pacific Railroad, hereinafter called the Debtor. Errors are assigned, which may be divided into two groups, legal and factual. Both the I. C. C. and the District Court have approved the proposed plan of reorganization. As yet, however, the plan has not been submitted to the creditors.

All parties seemingly agree that there must be a reorganization of the Debtor. The crux of the criticisms of the different groups of bondholders, represented by the various appellants, is that the old mortgage bondholders are not given enough securities in the new company, and to meet this objection, it is argued there must be a larger mortgage indebtedness placed on the new company. Larger mortgages will permit of distribution of more bonds to the present bondholders. The fact that they will be of less value is ignored.

At the bottom of all the criticisms of the new plan is the appraisal of old securities, and the allocation of the new securities to such old security holders. The legal questions are raised to prevent the present plan from being approved and made effective, in case we are satisfied that the plan is fair and equitable.

Generally speaking, the objecting bondholders contend that their securities were undervalued in the reorganization and that some other mortgage on another section of the property, was overvalued.

Because the factual and legal questions are so interrelated, it is necessary to make a somewhat lengthy statement of facts, even though abbreviated because of the full and complete story found in the report of the I. C. C., 239 I. C. C. 485, and 240 I. C. C. 257, and in the decision of Judge Igoe of the District Court in 36 F.Supp. 193.

The Debtor is a large railroad system, operating 9,906 miles of solely owned track, through twelve states. It has several sections, each being the basis of a separate mortgage indebtedness. Chief among these sections are the western half (from Mobridge, South Dakota, to the Pacific Ocean) acquired in 1909; the eastern half (the main part of the road); the Gary line, which joined Debtor in 1922; the Milwaukee and Northern, acquired in '93; and the Terre Haute, included by virtue of a 999 year lease, executed July 1, 1922.

Debtor was born of the Federal equity receivership of the former Chicago, Milwaukee & St. Paul Railroad, which terminated in January, 1928. There, as here, the mortgage trustees and groups of bondholders, demanded new securities in amounts similar to those outstanding, the load of which the predecessor debtor could not carry.

The creditors there took a position which ignored the long view future of the Debtor, ignored its public obligation character and sought a reorganization which served only the demands of the hour, which were met at the sacrifice of the future.

The court, unfortunately, was helpless. So was the I. C. C., which protestingly approved the plan which the narrow-visioned mortgage trustees and their advisers, set up. The present proceedings are the direct result of the ill-advised 1928 plan of reorganization. The road was forced to seek the aid of Section 77 of the Railroad Reorganization Bankruptcy Act, 11 U.S.C.A. § 205, shortly after it was made available.

Debtor submitted, with its petition, a plan, which was moratorium in nature. The doors of the I. C. C. were open and the Commission ready and anxious to go forward with its reorganization work, but no effort was made by any of the groups of investors, nor by the debtor, to formulate a reorganization plan until many months had passed. The situation seemed hopeless. Finally, the Institutional Investors, one of the Groups here interested, submitted a plan. It represented much thought and study. Its plan was a forerunner to a more complete one submitted by the I. C. C. Hearings were had and closed, only to be reopened and further hearings had. Modifications of the I. C. C. plan were made, and it, as modified, was finally approved by the I. C. C. It was later presented to the District Court, counsel were heard for and against the plan, and finally the court approved it. These appeals followed.

The facts are complicated and, in the hope that they might be more clearly and concisely presented, we have tabulated some of them in the form of a chart herewith set forth.

| Name of Security and Obligation | Amounts Issued and outstanding | A. Date Issued B. Date Matured | 1. Int. rate 2. Int. due 12/31/38 3. Annual Int. | Security is lien on | What Commission Gives to Security | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | First Mortgage Bonds | General Mortgage 4½% Bonds — Series A | General Mortgage 4½% Bonds — Series B convertible | 5% Preferred Stock | Common Stock No-par Value Shares |
| 50 year mortgage 5s of '75 | $106,895,096 out-standing | A. 2/2/1900 B. 2/1/75 | 1. 5% 2. $20,835,706 | Just behind lien of 1st & Refunding Mtg., i. e., is a 2, 3, 4 lien on property on which re-funding is 1, 2, 3 lien. Practically, it may be considered a 1st lien on western lines and 2 lien on eastern line. | (4% except Terre Haute) | | 15% 19,084,621 | 60% 76,388,481 | 25% 318,077 |
| Gen. Mtge. Bonds A, 4s B, 3½s C, 4½s D, 4½s E, 4¾s | $150,000,000 issued 48,241,000 8,950,000 42,597,000 24,000,000 15,000,000 137,788,000 in public hands 11,-212 pledged R. F. C. | B. 1989 | 2. $5,653,090 920,211 5,652,191 3,217,320 2,137,381 3) $5,952,225 | Lien on 6,054.88 miles of track, i. e., eastern line and much equipment. | (25%) 13,473,523 2,467,553 12,062,298 6,804,330 4,284,345 | (35%) 18,862,931 3,454,574 16,887,217 9,536,062 5,998,083 | (20%) 10,778,318 1,974,042 9,649,838 5,443,464 3,427,476 | (20%) 10,778,318 1,974,042 9,649,838 5,443,464 3,427,476 | |
| Convertible Adjustment Mtg., 5s, 2000 | $182,873,693 out-standing. | A. 2/2/1925—secured in 1928 reorganization. | 2) $79,550,055 | Lien just behind 50 yr. mtg. on all prop. on which 50 yr. mtg. is lien, i. e., 3, 4, 5 lien on property on which 50 yr. mtg. has 2, 3, 4 lien. | | | | | 1,749,492 |
| C. M. & Gary 1st Mtg. 5% 50 yr. (joined debtor in Jan. 1922; debtor of public, guaranteed prin-cipal of $3,000,000 and interest.) | $5,798,000 issued, $98,000 cancelled, $3,000,000 in hands of public, $2,700,000 pledged under 1st and Refunding. | A. 4/1/1908 B. 1948 | 2) $562,500 | 82.85 miles of track in Illinois. | | | | 75% 2,671,875 | 25% 8,906, ¼ |

| Name of Security and Obligation | Amounts Issued and outstanding | A. Date Issued B. Date Matured | 1. Int. rate 2. Int. due 12/31/38 3. Annual Int. | Security is lien on | First Mortgage Bonds | General Mortgage 4½% Bonds | | 5% Preferred Stock | Common Stock No-par Value Shares |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Series A | Series B convertible | | |
| | | | | **What Commission Gives to Security** | | | | | |
| C. M. 1st & Re-funding. | $8,866,000 issued, $8,923,000 outstanding, pledged to secure Govt. $943,000 in treasury. | A. 2/2/25 B. 6/1/43 | 1) 6% | 1st lien on 3,435 miles (western lines); 2nd lien on all prop. on which Gen. Mtg. and Belling. mtg. are 1st mtg. 3rd lien on prop. on which Mil. & Nor. Cons. is second lien. | | *h* | | | |
| Terre Haute Lease to Debtor 7/1/22 for 999 yrs. debtor to pay prin. of bonds and int. taxes. | $21,929,000 issued 250,000 Bedford 7,287,000 So. Ind. 8,056,000 Refund. 6,336,000 Terre Haute | 5s '38 4s '51 5s '60 5s '60 | Int. pd. to date; Bedford prin. in default. Annual int., $1,023,580. | Bedford, lien on 4.66 miles. So. Ind. lien on 240.92 miles. Terre H. lien on 115.17 miles. Terre Haute 2nd lien on above. | 250,000 7,287,000 8,056,000 6,336,000 | 2.75% fixed interest 1.5% contingent interest. | | | |
| Mil. & Northern 1st 4½s '39 | $2,155,000 issued $2,117,000 in public, 38,000 pledged 1st refunding mtg. | A) 6/10/1880 B) 6/1/10 extended to 6/10/39 | 2) $108,204 | 125.74 miles track in Wis. | 70% 1,554,143 | 30% 666,061 | | | |
| Mil. & No. Consolidated bonds. Con- 4½% | A) $5,092,000 issued B) $5,072,000 public 20,000 pledged. 1st refunding mtg. | A) 2/11/84 B) 6/1/34, extended 6/1/39 | 2) $247,260 | 1st lien 266.56 miles in Wis. & Mich. 2nd lien 125.7 miles on which Mil. & Nor. 1st lien. | 25% 1,329,815 | 35% 1,861,741 | 20% 1,063,352 | 20% 1,063,352 | |

We are dealing with facts and the facts are figures.

It is at once apparent that the Commission was confronted by a stupendous task. Its determination to recapitalize Debtor on a system-wide security basis increased the difficulties. The recapitalization of the Debtor at a much lower figure (appellants call it a "drastic cut") indicates a candid, realistic approach, but it was certain to arouse opposition.

It was this cut in the capitalization of the new debtor which is the real basis of the attacks on the plan. It has awakened much of the dissatisfaction to the plan. Isolated bondholders, or groups of holders of different issues, join in the assault. The basis of all criticisms, however, is the same. Each bondholder places a higher value upon his own security than did the Commission. Each likewise places a lower value upon the securities held by other and different bondholders, than did the Commission. Each gives a value to the new securities lower than the value of the bonds he is asked to surrender. The new bonds are described as ephemeral, worthless, or of conjectural value. In attempting to ascertain the value of their own security, they look at the value placed upon other securities and out of their prejudices, draw harsh conclusions. They convince themselves that there is favoritism in the apportionment of the new securities.

One group attributes the road's deficits to losses incurred on sections other than those covered by the mortgages of the complaining bondholders. Another group stresses reproduction cost of its division. Still another group asks us to ignore original cost, mileage, business produced, etc., and concentrate our attention on earnings. There is but one consistency in the position of all the dissatisfied groups. Each will be satisfied if its percentage of the new securities be increased, and the percentage allotted to other bondholder groups is reduced. Each holds in reserve a big stick (legal objections), which it wields threateningly, if a different and better allotment (which means larger bond issues under the new plan) is not made.

This chart, which tells its own story, shows that there are six divisions (eastern, western, Terre Haute, Gary, Milwaukee & Northern, and Bellingham), each of which is covered by a first lien bond issue and several junior mortgages.

It also shows the Debtor's capital structure to be as follows: 1,174,060 shares, of no par value, common stock, and $119,307,300 of 5% preferred stock, represented by 1,193,073 shares. Under the new plan this stock is wiped out. Nothing was allowed to the holders of either common or preferred stock. The I. C. C. found that the Debtor's assets were not equal to the aggregate of its secured and unsecured debts.

The secured obligations were:

Debtor's First and Refunding Mortgage of $9,866,000, of which $8,923,000 (all the outstanding) is pledged to secure the R. F. C. and other Government loans. This lien plays a negligible part in the controversy although the lien covers a large part of the Debtor's property. It is a first lien on the western lines, a second lien on the eastern lines, and a second lien upon other branches. No challenge of the plan is made so far as it affects this mortgage.

Another mortgage is known as the 5's of '75, a fifty year mortgage of which $106,395,096 is outstanding. Accrued interest to December, 1938, was $20,835,706. Save for the small First and Refunding Mortgage, it is a first lien on the western division.

Another issue is known as the Adjustment Bonds of which $182,873,693 are outstanding. The accrued interest thereon is approximately $80,000,000. This issue grew out of the 1928 equity receivership. This mortgage is just behind the Fifty Year Mortgage, and a third, fourth, and fifth mortgage on the property on which the 5's of '75 are a second, third, and fourth lien.

The so-called General Mortgage is an issue of $150,000,000 and is a first lien on the eastern half of the road. It also is a lien on much equipment. This mortgage secures five series of notes. The rate of interest varies from 3½ to 4¾%. Approximately $137,788,000 is held by the public, while a small amount secures loans by the Government. This mortgage covers the most valuable part of the entire system and its treatment in the reorganization is the subject of serious attack.

The Gary Mortgage covers 82.85 miles of track in Illinois. $5,798,000 was originally issued, of which $98,000 has been cancelled. Of the amount outstanding $3,000,000 is in the hands of the public, and $2,700,000 is pledged under the First and Refunding Mortgage heretofore referred to. This division is called a coal-carrying line.

Two other mortgages are known as the Milwaukee and Northern Company issues, the First Mortgage and the Consolidated Mortgage. Of the former $2,117,000 are in the hands of the public, and of the latter, $5,072,000 are in the public's hands. $38,000 and $20,000 of these issues respectively, are pledged to secure the First and Refunding Mortgage.

The Bellingham Bay Co. Mortgage amounts to $301,000 and is pledged to the R. F. C.

The Terre Haute mortgages, four in number of combined face values of $21,929,000, are a lien on the branch known as the Terre Haute lines, and as to the part this line and this mortgage play in the reorganization, the controversy is rich in intensity and fact conflicts. This mortgage existed before the railroad was acquired by the Debtor, and the report of the I. C. C. upon the value of these bonds and the circumstances under which the road was acquired, have given this transaction a malodorous reputation.

As to the disposition of this branch, the I. C. C. deliberated over the wisdom of two proposals—one contemplated cancelling the lease; the other retained the property, which necessitated the inclusion of the mortgage in the reorganization. When this lease was acquired, the Debtor agreed to pay the lessor's mortgage indebtedness. This division brings Indiana coal to Chicago for use by the Debtor on its other divisions.

In addition there are a few minor items of indebtedness such as: Equipment trust certificates, $33,322,999; loan from the R. F. C., $10,780,762.50; Railroad Credit Corporation loan, $2,995,312; General American Tank Car sublease liability, $822,119.54; unsecured claims approximately, $500,000. They are not exactly small, but over their disposition little or no controversy exists.

Under the approved plan of reorganization there were $34,506,999 of liens, undisturbed or extended. They are equipment obligations and a secured bank note above referred to. There is no objection to the plan so far as it disposes of these two items.

In the reorganization, a first mortgage issue was provided in the sum of $80,852,171. Of this sum, $58,923,171 draws interest at 4%, the balance, $21,929,000 is to pay off the Terre Haute obligations and draws interest at 4¼%, of which 2¾% is a fixed charge while an added 1½% interest charge is contingent.

There follows a General 4½% Mortgage covering two series, A and B, aggregating $108,678,780. Series A covers $57,256,669, and Series B, $51,422,111. The interest on both bonds is contingent. In case of earnings Series A is prior to Series B. Series A Bonds mature Jan. 1, 2014. Series B matures Jan. 1, 2039. There is also to be issued 5% preferred stock of the amount of $111,347,846, and 2,131,475¼ shares of no par value common stock.

The Terre Haute bonds are to be paid in full, but with lower rate of interest, a part of which is contingent.

For the Milwaukee & Northern First Mortgage bonds, 70% is to be paid in First Mortgage, and 30% in Series A Mortgage; and the Milwaukee & Northern Consolidated Mortgage is to be paid, 25% in First Mortgage, 35% Series A, 20% Series B, and 20% preferred stock.

The old General Mortgage bonds are to be paid 25% in First Mortgage Bonds, 35% in Series A General Mortgage, 20% in Series B General Mortgage, 20% in preferred stock.

The 5's of '75 are to be paid in 15% of Series B convertible, 60% in preferred stock, 25% in common stock.

The Gary First Mortgage bonds are to be paid in 75% preferred stock and 25% in common stock.

The unsecured claims of $500,000 are to be paid by the issuance of 15,837 shares of common stock.

Five million dollars of First Mortgage bonds are to be issued as new money bonds.

The plan of reorganization also calls for the creation of a so-called Additions and Betterments Fund. Annually, out of the available net income, not less than $2,500,000 is to be set aside for so-called Additions and Betterments. To the extent that expenditures are so provided for or reimbursed out of the Additions and Betterments Fund, the new company is denied the right to issue any bonds or other evidences of indebtedness or any stock, ranking as to either assets or dividends, in priority to, or on a parity with, the new preferred stock.

This fund is assailed by several of the appellants, and the principal ground is that it is larger than necessary. Inasmuch as the Commission first determined the amount of bonds and capital stock which the road could carry and meet all of its obligations, which determination was measured by its available net income, it was argued that the

reduction of this income by $2,500,000 resulted in an unnecessary reduction in the amount of the indebtedness and in the amount of available capital stock of the new company.

■ At once observable, the fairness of the allocations involves factual issues. While question-arousing arguments have been advanced for and against the plan, which invite lengthy discussion by us, the outstanding, unchallenged fact is that the conclusions of the I. C. C., approved by the District Court, are entitled to great weight, and we are hardly justified in substituting our judgment for that of those tribunals, save where clearly satisfied that their judgment is erroneous, or is based upon incorrect assumptions, or where an incorrect rule or principle is applied. In making this observation, we are not unmindful of the Los Angeles Lumber case, infra, to the effect that the fairness of any reorganization plan presents a legal question and one we cannot and should not evade or avoid.

True, their findings are based upon figures found in the Debtor's reports, and there is no advantage which the original fact-finding body enjoys because it first saw the figures. Unlike those cases where the fact finder sees and hears human witnesses, and the latter's credibility is involved, the cold figures found in the reports, showing the volume of business, costs of operation, and earnings, tell the same story to all.

■ That tale is replete with the sad account of losses and more losses, of ever-increasing cost of operation, of transfer of business to trucks and busses, of increase in labor costs and in taxes. Taking the last decade of operation as our study, there is small room for dispute. There can be no serious or intelligent contention that this railroad can support its present financial set-up.[1] That all interest charges must be reduced is certain. That a division of such charges into fixed and contingent, is desirable or necessary, may be accepted with equal confidence. The I. C. C. was confronted by a condition and not a theory. Approximately $120,000,000 of accrued and unpaid interest was due December 31, 1938. That amount has been nearly doubled since. Reduction is possible only by lowering the principal of the mortgages, and part of the interest on said mortgages must be contingent.[2]

Accepting this unavoidable conclusion, the necessary deduction follows that existing mortgages must be scaled down. But how? The court in Consolidated Rock Products Co. v. Du Bois, infra, has pointed the way and laid down the applicable rules for our guidance. Unfortunately that decision was announced after this plan had been approved by the I. C. C. That it necessitates a rejection of said plan has been asserted, as well as denied, by the opposing parties. That it must be our text for determining the disposition of this appeal is quite clear.

The Consolidated Rock Products Company case, the Boyd case, and the Los Angeles Lumber Co. case, infra, read together, lay down the rules governing simple, as well as the fact-complicated, reorganizations.

The Consolidated Rock Products case contains a complete statement of the applicable reorganization rules. It is entirely consistent with the holdings and intimations of the Los Angeles case. We find nothing in either case which would defeat the plan here in question, provided the evidence, and necessary findings are made, based on such evidence, and they establish the fairness of the plan.

■ The holdings of the Consolidated Rock Products case, here pertinent, are:

(a) The necessity of the application of the absolute priority principle to reorgani-

---

[1] No dividends have been paid on common or preferred stock in over five years. We may take judicial notice of the fact that neither stock has substantial market value and has not for five years.

On the Adjustment Mortgage bond the unpaid interest is, to date, more than half as large as the principal. As of December 31, 1938, the unpaid cumulative interest was approximately $80,000,000. The unpaid interest on the 5's of '75 now is one-third of the principal or over $30,000,000.

Vast sums of interest are unpaid on the General Mortgage bonds.

Moreover, the company could not have operated at all but for moneys advanced by the R. F. C., the R. C. C., the P. W. A., and the bank. The purchase of equipment was made possible only by the borrowing of money through prior lien equipment securities given to the vendors.

[2] "Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a sine qua non to a determination of the integrity and practicability of the new capital structure." Consolidated Rock Products Co. v. Du Bois, infra.

zations of solvent and insolvent corporations;

(b) Interest accrued on bonds (not contingent interest which has not been earned) is entitled to the same priority as the principal;

(c) Future earning capacity of the enterprise is the criterion for the determination of values of assets of commercial corporations, as well as of the practicability and fairness of the plan of reorganization, where as here, the assets are productive properties. In railroad reorganizations, values are to be determined by the rule stated in Sec. 77, sub. e, 11 U.S.C.A. § 205, sub. e.

(d) There must be an approximate ascertainment of the value of the respective assets where different liens cover different properties;

(e) The absolute priority principle does not prevent creditors from being given inferior grades of securities or securities of the same kind as given to junior interests, provided the senior lienholders are given securities of the value equal to the value of liens displaced;

(f) Prior lien creditors must be compensated for the loss of their prior claim rights;

(g) Unified operation of debtor may well require the elimination of division mortgages in a plan of reorganization;

(h) Simplicity of capital structure may often be preferred to a highly complicated one difficult for security holders to understand;

(i) The new capital structure may be revolutionary and need not be patterned after the existing structure;

(j) Findings must be made on all vital issues, controverted and uncontroverted, and must include values of properties separately considered and also of Debtor's property as a whole. Findings must cover values of liens to be surrendered and values of securities given in exchange. They should specifically cover the ultimate (not evidentiary facts) facts upon which the values are based. They must show that fixed interest charges are included and show that values are based on income-producing factors.

Taking the appellants' contentions seriatim, we first consider the objections of the preferred and common stockholders.

Naturally their predicament excites our sympathy. Their unhappy situation, however, is in no way due to the plan of reorganization. In fact the plan was made necessary by the hopeless state of Debtor's finances, a condition which has grown worse each passing year for a decade. Only the Debtor's bankruptcy proceeding and aid from the Government, in way of loans, have kept the creditors from barring the stockholders out of the picture some years back.

The Commission found,[3] under its method of calculation, that there was no equity remaining in the old company and the old stockholders, both common and preferred, have no legal right to a share in the securities of the new company. In passing it might be observed that it is not a question of the right of stockholders to receive something in the reorganization. A question of fact confronted the Commission and now confronts us. Neither the Commission nor the court is authorized or permitted to give these stockholders anything, if the Debtor's assets are of a value less than the aggregate of its debts. Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 685, 85 L.Ed. 982; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 23 S.Ct. 554, 57 L.Ed. 931. It is not a matter of discretion. The absolute priority principle forbids it.

This finding[3] is sharply challenged by the old stockholders who point to the present, sharp upturn of business activities, particularly railroads, stating that the first eight months of 1941 show an increase in gross operating revenues over 1940 of 22.8%, and estimate that the income available for fixed charges for 1941 will be $31,140,683. (Appellees challenge these figures on the ground no adjustment is made for 1941 Federal taxes or the raise in railroad wages just allowed.) Also present is the question of this court's power to base its decision upon 1941 statistics which are not in the record before us.

The stockholders also point to testimony which tended to show that reproduction cost, plus land values, gave Debtor and Terre Haute properties a total valuation of $861,677,370, a sum sufficient to give some value to the equity of the stockholders.

---

[3] " * * * We find that the equity of the holders of the debtor's preferred stock and its common stock has no value and that the holders of claims in classes 24 and 25, therefore, are not entitled to participate in the plan." [239 I.C.C. 571].

They also challenged the lack of a real finding on valuation, and assail the substitute finding of capitalization figure which was arrived at by using as a basis the average annual sum available for fixed charges. They state that this basic sum was greatly lessened by unusually heavy maintenance charges—unnecessary replacements (though desirable) such as treated ties, etc.

 We are well satisfied that the evidence supports the finding of the Commission approved by the District Court "that the equity of the holders of the debtor's preferred stock and its common stock has no value." And this is true even though the evidence of current earnings made since the plan was approved, is received and considered.

 Assuming as we must that the commercial value of Debtor's property consists in the expectation of income from it (Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041), there is no support for a finding of value in Debtor's preferred or common stock. Debtor's property being productive, valuations based on other than earning bases may be considered only as such valuations may bear on earning capacity. Consolidated Rock Products Co. v. Du Bois, supra. But modifying and elaborating on this rule see section 77, sub. e, last paragraph.

 If the Commission gave value to the common and preferred stock, it would have violated one of the first requirements of a valid reorganization as announced in the Consolidated Rock Products Company case. It would have taken property from the mortgagees and given it to the stockholders, an act which would not only have violated the law but would have transgressed all the rules of fairness which must be at the bottom of all reorganization plans.

The General Mortgage Bonds and the 5's of '75 may well be considered together because the argument of each is so closely connected with its attack on the other. The General Mortgage bondholders attribute the unfortunate condition of the system largely to the deficit which is yearly incurred in the western division of this road (which is liened by the 5's of '75).[4]

In view of the reversal and remanding of this case for the making of findings, which we find it is necessary to order, we will not discuss at great length, or in great detail, the fairness of the plan with respect to these two mortgages. It is sufficient to observe that the fact situation permits of a plan such as the Commission formulated and approved. The plan as such, ignoring the absence of findings, has support in the evidence. It violates no requirements (save findings) announced in the Consolidated Rock Products case.

Accepting the rule there announced for determination of value (to-wit, earning power) the 5's of '75 have, we think, no legitimate complaint. Sec. 77, sub. e does not change our conclusion.

 The General Mortgage bondholders, apparently, underestimate the value of the new stock and the Series A and B bonds in the new organization. Moreover, it must be kept in mind that these General Mortgage bondholders, at present, have holdings that are far from Class A securities. They are bonds on which interest is in default in large sums and has been for a substantial period. The properties upon which this mortgage is a first lien can hardly stand alone. It is dependent in part for its showing upon other sections of the road. Its condition has not been improving. Its maintenance charges, especially in the winter time, are large. Unusually fine paved highways along its side, give promise of continued competition from trucks and busses, which is far from reassuring.

Accepting, as we do, the necessity for a drastic reduction in indebtedness and interest requirements and realizing that each of these divisions, to a certain extent, depends upon the existence and business of other branches of the system, we are unable to say the evidence fails to establish the fairness of the plan so far as these bonds are concerned.

[4] It would not require much discernment to place the responsibility for this road's present predicament to the bad judgment of those who built the western division. They loaded the whole system with a hopeless debt, provided no means for its retirement and got, when this division was completed, a branch that produced an annual deficit of over five million dollars. But criticisms should not stop here. A management with ethics which would tolerate the Terre Haute transaction was sure, sooner or later to be applying to a court of equity or court of bankruptcy for protection against the hordes of insistent claimants with past due unpaid obligations. Proof of what may be done under honest and efficient management may be found in the records of the railroad since trustees under these bankruptcy proceedings took over.

If the proposition were an original one, it is true, we can readily see how a larger percentage of the new plan first mortgage bonds might have been given to holders of the General Mortgage bonds. On the other hand, while there is a difference in the priorities of the first mortgage bonds and the Series A bonds of the new issue, this may be made up in increased interest rates of the new bonds, especially if the increased revenues of the company, as disclosed during the year 1941, are maintained even in part. There is, however, in our opinion, a serious question presented due to the small percentage (25%) of the First Mortgage bonds given to the holders of old General Mortgage bonds. Our suggestion is that if any revision should be made, this percentage might be increased and the percentage of Series B and preferred and common stock, reduced.

The serious attack made on that portion of the plan which calls for the mandatory payment of $2,500,000 into the Additions and Betterments Fund, calls for no extended discussion. Counsel contend that the sum is excessive and unfair and does not affect all security holders equally. We think otherwise.

While there must be more fact findings upon which to reach a final conclusion on this, as well as the other phases of the plan, we believe the Commission is entirely sound in its position that a fund for Additions and Betterments should be created. In fact we find few things in the plan which appeals stronger than this provision.

Failure to provide against financial and commercial storms and other adversities which affect railroads, like other industries, accounts for much of the condition of the railroads today. The possible avoidance of such recurrence will be aided by this or a similar provision. It would be improper to pass directly upon the reasonableness of the amount, however, until the findings which must be made are before us. However, we may say that there is evidence that would amply warrant an allowance for such an item, and also the amount adopted by the Commission. But findings there must be, based on the evidence, which support both the allowance and the amount of the allowance.

Our present conclusion is that the record supports the new plan as far as the amount of indebtedness which this railroad will bear is concerned. We think the reorganization plan which simplifies the financial structure also is to be approved and commended.

This, (prospective income as basis of plan of reorganization), it seems to us, is the corner stone of a sound reorganization plan. What is the income upon which the new set-up is to rest? This is the first question that must be answered. And the answer must be a dependable one. For meeting the obligations of the new company can not be left merely to hopes of favorable winds. A decade of indisputable statistics is available. The realization of expected earnings is essential to the future of Debtor. Every dollar of value of Debtor should be allotted to its creditors (and, if the showing warranted it, to the stockholders), but there is neither justification for, nor satisfaction in, a plan which tomorrow brings only a harvest of barren regrets.

No plan of reorganization (and for that matter, any original financing) can be justified, called safe, or sound, or honest, unless there is made provision, which has reasonable promise of fulfillment, for the meeting of corporate obligations, whether represented by notes or stock. Dependence on luck, unforeseeable future profits, or wild hopes is the first step toward bankruptcy and the end is often even worse than an experience in a court of bankruptcy.

We can not, at this time, give approval to the plan in all its details, however, without further findings of fact which the Commission must make.

Our conclusion that more findings are necessary, makes it unnecessary to discuss, save generally, the position of the Terre Haute and the Gary mortgages. Under the new plan they are wiped out and the new securities given. Simplification was thereby obtained, and we approve of that. It is quite impossible to approve of the disposition of the Terre Haute bond issues without having more specific findings. Whether this lease should not be now terminated presents a separate question, which can only be determined when findings are made. The same observation applies to the reorganization plan so far as it affects the Convertible Adjustment bonds, the Milwaukee and Northern bonds, and the Bellingham bonds. It may be observed that in our opinion there is evidence in the record to support the plan as proposed, but it cannot receive final approval until and unless there are findings made upon such evidence, and then the parties interested may have the right to review both the sufficiency of the

findings to support the plan and the existence of evidence to support the findings.

This brings us to that phase of this appeal which is based upon the failure of the Commission to make the necessary findings required by the Consolidated Rock Products Company case. There is undoubted support for the argument that the Commission inferentially made findings when it allocated the new securities to the old mortgages. But the fairness of that allocation is dependent upon the findings of fact. Without such findings we cannot intelligently approve or disapprove.

■■■ We appreciate that the findings of fact must, in the last analysis, be based upon evidence, much of which is to be found in the report of the I. C. C. Hence it may well be argued that the I. C. C. could make such findings by taking notice of its reports and the statistical information in its files bearing upon the income of this railroad and of its various branches. Reluctant as we are to do so, we nevertheless feel that under the decision of this controlling case, there must be a return of the cause to the District Court with direction to the District Court to return it to the I. C. C. and for that body to make the findings on issues vital to the question of values and equities as announced in said Consolidated Rock Products case. *Likewise, the findings must be so specific that the court may definitely see that in the new plan, provision for full compensation of cancelled old senior securities, and all prior preferred positions, is made.* The findings must be sufficiently complete on these matters, that the court may, from its examination, ascertain whether full compensation has been made for the entire bundle of rights which each of the creditors is called upon to surrender.

■■■ It would be begging the question to assume that findings were necessarily made by the I. C. C. when the allocation was made. We would be delegating to the I. C. C. an obligation which is ours. The Commission must formulate its plan. It must make fact findings supported by the evidence upon which its plan is based. We must independently determine whether the plan is fair and equitable. In reaching our conclusion we must ascertain (a) whether there is evidence sufficient to support the findings and (b) we must be able to say that the findings support the plan, and (c) the plan is fair and equitable.

As to the necessity and character of the findings, the court in the Consolidated Rock

Products case spoke and the rule it announced applies to the I. C. C. in railroad reorganizations as fully as it applies to the District Court in other reorganization cases. Save as modified by Sec. 77, sub. e, the Commission should follow the opinion in that case.

In the report of the Commission there is a discussion of the various factors which were deemed pertinent in its inquiry into values. Absent, however, were clear cut findings of values which are so essential to the intelligent approval of the plan. Our criticism is not directed to the fact that the findings were embodied in the Commission's report (a large part of which is devoted to a discussion and statement of the evidence) rather than stated specifically as findings. But the fault lies in the fact that we are left uncertain, or in the dark, as to the finding of the Commission. The evidence might support a finding of a larger or a smaller amount. Which should we accept? The fact finding body is the I. C. C. It must find. We cannot.

Somewhat similar was the situation in the case of Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 162, 51 S.Ct. 65, 75 L.Ed. 255, a case which arose from a three-judge District Court in this circuit. Illinois Bell Tel. Co. v. Moynihan, 38 F.2d 77. In the absence of specific findings the Supreme Court set aside the decree and remanded the cause to make the necessary and appropriate findings. It refused to accept the conclusions of the District Court as inferential expressions of its fact conclusions. See, also, Public Service Commission v. Wisconsin Telephone Co., 289 U.S. 67, 53 S.Ct. 514, 77 L.Ed. 1036; United States v. Magnolia Petroleum Co., 276 U.S. 160, 48 S.Ct. 236, 72 L.Ed. 509, and Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L.Ed. 1051.

■■■ The explicit holding of the Consolidated Rock Products case is so mandatory that further discussion is unnecessary. We can not accept the Commission's discussion of the evidence as a finding. Nor may we make findings, save where there is no dispute, or dispute is not serious, in order to sustain the plan.

■■■ No. 7686. This separate appeal (consolidated for argument with the other appeals) is from an order denying the Debtor's motion to have the list of creditors, particularly bondholders, revised and brought down to date.

We are not convinced that there was an abuse of discretion by the District Judge in denying this motion at the time it was made.

It must be conceded that intelligent action on the plan by the creditors is necessary as well as desirable. An up-to-date list of those who hold the bonds may be necessary in order to reflect widespread approval or disapproval. We are not fully advised as to the extent or correctness of the lists which are now available. Likewise a list prepared when this motion was made may well have been premature. It could become almost worthless, through change of ownership, before the vote is taken. We think it best to leave the matter as it is, in the hands of the District Court, with the admonition that if and when the plan is approved, or its approval quite certain, there will be a complete and accurate list of creditors prepared, to whom the plan will be submitted for approval or rejection.

We believe the motion at the time was wisely denied, and the order of the court is affirmed.

The order of the District Court is reversed, with directions to the District Court to set aside its order of approval and to remand the case to the I. C. C. for the making of findings, and, if necessary, the taking of additional evidence, that additional findings may be made, as heretofore indicated.

The trustees of the property of the Debtor shall pay the costs of printing the transcript of record, which sum is $3,327.20. The said trustees of said Debtor are hereby directed to pay said sum to the Clerk of this Court. The sums heretofore paid by each appellant upon the filing of its appeal shall be borne by each said appellant.