## In re CHICAGO, M., ST. P. & P. R. CO.

### No. 60463.

District Court, N. D. Illinois, E. D.
June 22, 1944.

386

Stewart & Shearer, of New York City, and Wilson & McIlvaine, of Chicago, Ill., for United States Trust Co. of New York.

Wright, Gordon, Zachry & Parlin, of New York City, and D'Ancona, Pflaum, Wyatt, Marwick & Riskind, of Chicago, Ill., for Chemical Bank & Trust Co.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, and Tenney, Sherman, Rogers & Guthrie, of Chicago, Ill., for Guaranty Trust Co.

Shearman & Sterling, of New York City, and Montgomery, Hart, Pritchard & Herriott, of Chicago, Ill., for National City Bank of New York.

Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., and Scott, MacLeish & Falk, of Chicago, Ill., for St. Louis Union Trust Co., and Illinois State Trust Co.

Mitchell, Capron, Marsh, Angulo & Cooney, of New York City, and Winston, Strawn & Shaw, of Chicago, Ill., for City Bank Farmers Trust Co.

Sidley, McPherson, Austin & Burgess, of Chicago, Ill., for Institutional Investors Committee.

Oliver & Donnally, of New York City, and Sidley, McPherson, Austin & Burgess, of Chicago, Ill., for Mutual Savings Bank Group.

Guggenheimer & Untermyer, of New York City, and Perlman, Goodman, Hecht & Chesler, of Chicago, Ill., for Anglo-Continentale Treuhand, A. G.

McDonald & Richmond, of Chicago, Ill., for Imperial Trust Company, Limited, and others.

Shulman, Shulman & Abrams, of Chicago, Ill., for Israel Abrams and others.

James L. Homire, of Washington, D. C., and Lee Walker, of Chicago, Ill., for Reconstruction Finance Corporation.

Irwin L. Tappen, of New York City, and Wilson & McIlvaine, of Chicago, Ill., for University Group.

A. Perry Osborn, of New York City, and Gottlieb & Schwartz and Chapman & Cutler, all of Chicago, Ill., for a Fifty-Year Bondholder Group.

Hodges, Reavis, Pantaleoni & Downey, of New York City, and Malcolm Mecartney and James J. Kilgallon, both of Chicago, Ill., for E. Stanley Glines and others, a Fifty-Year Bondholder Group.

Frank C. Nicodemus, Jr., of New York City, and Irving Herriott, of Chicago, Ill., for an Adjustment Bondholder Group.

John F. Rich, of Boston, Mass., and Wham, Rose & O'Brien, of Chicago, Ill., for another Adjustment Bondholder Group.

Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for Preferred Stockholders Protective Committee.

Ernest S. Ballard and Minier Sargent, both of Chicago, Ill., for Massachusetts Mutual Life Ins. Co. and others.

Hunt, Hill & Betts, of New York City, and Eckhart, Klein, McSwain & Campbell, Gann, Secord, Stead & McIntosh, Bell, Boyd & Marshall, W. F. Peter, Cassels, Potter & Bentley, and Mayer, Meyer, Austrian & Platt, all of Chicago, Ill., for various Chicago, Terre Haute & Southeastern Ry. Co. interests.

John L. Hall and James Garfield, both of Boston, Mass., and Helen W. Munsert and Luther M. Walter, both of Chicago, Ill., for Chicago, Milwaukee, St. Paul & Pacific Railroad Co., debtor.

A. N. Whitlock and M. L. Bluhm, both of Chicago, Ill., for Henry A. Scandrett and others, trustees of the property of the debtor.

IGOE, District Judge.

The Court has for consideration the Modified Plan of Reorganization of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Debtor, approved by the Interstate Commerce Commission in its Third Supplemental Report and Order of April 10, 1944, duly certified to this Court, together with a transcript of the proceedings before the Commission, all objections to said Plan and claims for equitable treatment filed by parties in interest and also all petitions for allowances to be paid out of the Debtor's estate for services rendered and expenses incurred in connec-

tion with the proceedings and plan for the period from May 16, 1940, to August 31, 1943, both inclusive.

The Court heretofore approved a Plan of Reorganization for this Debtor by its Order and Decree of November 13, 1940, entered pursuant to the Court's Opinion of October 21, 1940, in Re Chicago, M., St. P. & P. R. Co., Debtor, D.C., 36 F.Supp. 193. The Plan before the Court at that time was approved by the Supplemental Report and Order of the Commission of June 4, 1940. The Court, in that Opinion, set forth a history of the proceedings, a description of the properties of the Debtor and a statement of the obligations and the treatment accorded them. Those matters will not be repeated here.

Appeals were taken from the Order and Decree approving the Plan to the United States Circuit Court of Appeals for the Seventh Circuit. Chicago, M., St. P. & P. R. Co. v. Group of Institutional Investors et al., 124 F.2d 754, 766, decided December 4, 1941. The Appellate Court reversed this Court holding that there were insufficient "findings on issues vital to the question of values and equities" as announced in the Consolidated Rock Products case (Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982) and directed that the proceedings be returned to the Commission for the making of the necessary findings. The Appellate Court held, however, that there was sufficient evidence to support the findings of the Commission approved by this Court "that the equity of the holders of debtor's preferred stock and its common stock has no value", even though the evidence of current earnings made since the plan was approved were considered.

Certiorari was granted by the Supreme Court of the United States and on review that Court overruled the Circuit Court of Appeals on the question of sufficiency of findings and held that the Commission, in formulating the plan, had complied with the Statute. Group of Institutional Investors et al. v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959. The Supreme Court, however, held that there were two questions which required further consideration by the Court and the Commission. The first of these was the question of whether the General Mortgage of Chicago, Milwaukee & St. Paul Railway Company or the Debtor's

First and Refunding Mortgage had first lien upon certain so-called "pieces of lines east", seventeen in number.

The other question related to compensation to senior bondholders, the Court concluding that since the senior bonds received under the plan only a face amount of inferior securities equal to the face amount of their claims and junior bonds likewise participated in the plan, the Commission and the District Court should determine what the senior bonds "should receive in addition to a face amount of inferior securities equal to the face amount of their old ones, as equitable compensation, qualitative or quantitative, for the loss of their senior rights."

The proceedings came back to this Court and thereafter the Court resolved the issue of the "pieces of lines east" by its Opinion of June 21, 1943, and decided that the General Mortgage had first lien upon only one of the seventeen pieces involved. In the plan it had been assumed that all of the pieces were subject to the lien of Debtor's First and Refunding Mortgage as the mortgage of first lien. Following the decision upon this question, the proceedings were referred back to the Commission for further consideration in conformity with the Opinion of the Supreme Court of the United States and in its Order of reference the Court suggested that the plan should provide that the appointment of the Reorganization Managers should be subject to ratification by the Court. The Commission, after a hearing, approved a Modified Plan of Reorganization by its Second Supplemental Report and Order of December 6, 1943.

### Plan of December 6, 1943.

In this plan the Commission found, with no party contending otherwise, that the decision of this Court as to the "pieces of lines east" did not require any change in allocation of securities as between the General Mortgage and the Fifty Year Mortgage Bondholders since for the entire period from June 29, 1935, to December 31, 1942, the total income available for fixed charges assignable to the one piece upon which it was found that the General Mortgage had first lien was $170,800 as compared with income available for fixed charges assigned to the remaining sixteen pieces for the same period of $5,558,601.

The Commission approved the suggestion of the Court as to the ratification of the appointment of Reorganization Managers.

In dealing with the question of compensation to senior bondholders, the Commission changed the effective date of the plan from January 1, 1939, to January 1, 1944. It provided for the payment in cash of amounts representing all unpaid interest to the effective date upon all Milwaukee & Northern Railroad Company First Mortgage Bonds and Consolidated Mortgage Bonds, all unpaid interest on General Mortgage Bonds from January 1, 1939, to January 1, 1944, and all unpaid interest earned on the General Mortgage Bonds prior to January 1, 1939. The amount of interest to be paid on the General Mortgage Bonds accruing prior to January 1, 1939, was $13,008,912. This plan provided for a reduction of the face amount of preferred stock awarded to General Mortgage Bondholders in the prior plan by said amount of $13,008,912 and by the further amount of $1,970,896 of interest accrued on the General Mortgage Bonds prior to January 1, 1939, but paid after that date. This plan also provided for the payment to the Fifty Year Mortgage Bondholders in cash of amounts representing all unpaid interest from January 1, 1939, to January 1, 1944.

Of the preferred stock released as a result of the provision for cash payment to General Mortgage Bondholders, $750,000, par value, was awarded to Chicago, Milwaukee & Gary Railway Company Bondholders, this being an amount equal to the full interest accrued on said bonds from January 1, 1939, to January 1, 1944. The balance of said preferred stock was given to the Fifty Year Bondholders and a corresponding amount of no par common stock was withdrawn from allocation to the Fifty Year Bondholders and allocated to the Adjustment Mortgage Bondholders. The total cash to be paid under this plan amounted to $52,038,036.

This plan also provided that in view of the reduction which had been accomplished in the claim of the Reconstruction Finance Corporation, the payment of the Note formerly held by Continental Illinois National Bank & Trust Company and the reduction in the amount of First Mortgage Bonds authorized to be issued for new money at reorganization, additional First Mortgage Bonds in the aggregate amount of $7,096,336 should be distributed to the creditors, other than Reconstruction Finance Corporation, participating in First Mortgage Bonds in the proportion in which they were allocated by the prior plan. The junior securities released by the distribution of these First Mortgage Bonds were allocated in their order to the junior creditors as set out in the plan. This plan also provided a sinking fund for the retirement of First Mortgage Bonds and for the creation of a debt retirement fund through payments equal to 50% of dividends paid on the new common stock and the application of the fund to the retirement first of new General Mortgage Income Bonds and thereafter to the retirement of new preferred stock. It also contained a provision for a so-called escape clause whereby the payment of interest or principal upon the bonds might be postponed upon the consent of not less than 75% in amount of the bonds outstanding.

This plan provided for an alternative distribution of securities in the event the claim of the Reconstruction Finance Corporation should be paid and also approved the corrections and clarifications made by this Court and set out in its former opinion. Aside from the changes above mentioned, this plan was as set forth in the Commission's Order of June 4, 1940.

## Modified Plan of April 10, 1944.

Certain petitions for modification of the plan of December 6, 1943, were filed and thereafter the Commission, on April 10, 1944, approved the Modified Plan now before this Court. This Modified Plan makes certain other adjustments in the plan of December 6, 1943, which will be briefly summarized.

The escape clause above referred to was modified to provide that the payment of the principal of the bonds may not be postponed for a longer period than twenty years from the maturity designated in the bonds and that the maturity of interest may not be postponed for a longer period than five years but in no event beyond the maturity date or the maturity date extended of the principal. The provisions as to the preferred stock are modified so as to make definite provision that dividends of 5% be paid or declared on preferred stock before any dividends in respect to the same income period may be paid or declared on the common stock,

to provide that dividends at the rate of 5% on the preferred shall be assumed to have been paid for the three consecutive calendar years immediately preceding the effective date of the plan for the purpose of determining the applicability of the provision that payment of full dividends for three immediately preceding consecutive income periods on the preferred stock shall be a prerequisite to the payment of common dividends, and to clarify the authority of the directors of the new company to declare dividends on the Series A preferred stock with respect to income periods between the effective date of the plan and the date of consummation. Provision is also made that the term of the Voting Trust shall begin on the date of the order of the Court directing consummation of the plan rather than on the date of its confirmation. There is a further provision that the preferred stock, Series A, shall have the right to elect not less than two directors after default of the equivalent of six quarterly dividends and the affirmative vote of the holders of two-thirds of such stock is required to authorize any charter or by-law amendment materially altering any provision of that stock. There is an accounting provision authorizing the exclusion from the computation of income available for fixed charges for purposes of determining the amount of available net income for contingent interest, the additions and betterments fund and the sinking funds, of that part of the charges to operating expenses representing the service value of nondepreciable roadway property retired and not replaced. In connection with the Voting Trust, there is a provision for the designation of members of the Reorganization Committee and Voting Trustees in case the Court shall find that the interest of any of the parties otherwise entitled to make such designations is no longer substantial and authorizing the Court to designate Voting Trustees if any of the parties entitled to make such designations fail to do so within a reasonable time.

This Modified Plan also provides that the appointment of Voting Trustees shall be subject to the Commission's approval, a matter which is dealt with later in this Opinion.

### Objection to the Modified Plan.

Objections have been filed to the Modified Plan by the Debtor, the Preferred Stockholders Group, the University Group of General Mortgage Bondholders, the Trustees under the Adjustment Mortgage and two Adjustment Mortgage Groups, and the Trustees under the Gary Mortgage.

The Debtor asks that the plan be reconsidered in the light of the increased earnings, the increase in the ratio of net to gross and the accumulation of cash, and contends that on the basis of these considerations the plan should not, in fairness, exclude the stockholders from participation.

■ The right of the stockholders to participate has been considered by the Interstate Commerce Commission, by this Court, by the Circuit Court of Appeals and the Supreme Court of the United States. Increased earnings and the ratio of net to gross have been brought to the attention of the Commission and the Courts. The Supreme Court has aptly said [318 U.S. 523, 63 S.Ct. 739, 87 L. Ed. 959]:

"As we have noted the Commission conceived as its responsibility the devising of a plan which would serve 'as a basis for the company's financial structure for the indefinite future.' We cannot assume that the figures of war earnings could serve as a reliable criterion for that 'indefinite future.'"

The accumulated cash is required to make the cash payments contemplated by the plan and at the same time meet the reasonable requirements of the railroad. The Trustees feel that at present there is not sufficient additional cash available to pay the indebtedness to the Reconstruction Finance Corporation in accordance with the alternative provision contained in the plan. This Court, after careful and serious consideration of the entire record and viewing it from the standpoint of the present time, is fully satisfied of the fairness of the provision of the plan excluding the stockholders from participation.

What has been said with reference to the objections of the Debtor applies with equal force to those of the Preferred Stockholders Group.

■ The objection of the University Group is based entirely upon the failure of the plan definitely to provide for the payment in cash of the indebtedness to Reconstruction Finance Corporation. One Adjustment Mortgage Bondholder Group and the Gary Trustees join in this objec-

tion. The plan makes an alternative provision for such payment and contemplates that the Court, in its discretion, may authorize it if and when funds are available for that purpose. The Court interprets the plan to authorize the Court, in its discretion, to direct such payment at any time prior to consummation of the plan when funds can be spared to make the payment. In view of the statement made in behalf of the Trustees that, in the light of requirements presently known and reasonably to be anticipated, they could not recommend the payment of this claim at the present time, the Court feels that it is not justified in directing payment immediately upon approval of the plan. However, the question will be left open for further consideration upon petition by the Trustees or any interested party.

■ The objections of the Adjustment Mortgage Trustee and the Adjustment Mortgage Bondholder Groups will be considered together. Objection is made to the change of the effective date. The Gary Mortgage Trustees likewise join in this objection. No argument should be required to demonstrate the desirability of having an effective date as near as possible to the date of expected consummation. After all, the effective date is merely a date selected for convenience in carrying out the mechanics of the plan. There is no question about the right of the Commission to advance the date and the Court believes that no sound reason can be presented against the wisdom of the change.

Objection is also made to the restriction upon the payment of dividends on common stock. That provision was embodied in the previous plan and the present provision is more favorable from the standpoint of the Adjustment Mortgage Bondholder Groups since the present plan provides that dividends on the preferred for the purposes of the limitation clause shall be presumed to have been paid during the years 1941, 1942 and 1943. No further change in that regard would appear to be desirable.

■ Objection is also made to the securities retirement fund but this objection seems to the Court to be unsound. As pointed out by the Commission, this provision of the plan takes nothing from the common stock eventually as it gradually removes the drain on income of securities prior in rank to that stock and materially adds to the assurance of payment of portions of the existing senior claims. Moreover, the Commission states and the Court agrees that this provision is an important element in the compensation accorded to senior bondholders.

■ There are a number of objections to the Voting Trust but the main provisions relating to the Voting Trust were in previous plans and have already been considered by the Court. Aside from the provision relating to the approval of the appointment of Voting Trustees, hereinafter discussed, the Court feels that the Voting Trust provision is fully justified. The Committee for Adjustment Bondholders objects that it is not authorized to designate a Voting Trustee. This Committee came into the proceeding at a rather late date. Adjustment Mortgage Bondholders had been represented in the proceeding by the Trustee under the Adjustment Mortgage from an early date in the proceeding and the right to designate one Voting Trustee is given under the plan to the Adjustment Mortgage Trustee. This Trustee acts in behalf of all Adjustment Mortgage Bondholders and the Court sees nothing unfair or inequitable in giving it the right of designation, particularly in view of the comparatively recent entrance of the Committee into the proceeding. One group of Adjustment Mortgage Bondholders urges reconsideration of the plan in view of the changed economic conditions. It seems to the Court that the answer to this claim is the same as that made to the claim above discussed that the stockholders should be allowed to participate.

■ The Gary Mortgage Trustees, in addition to the claim relative to the effective date, heretofore discussed, urge that the Modified Plan still does not give them adequate participation. The fact is that the Modified Plan gives additional compensation to the Gary Bondholders by the allocation of preferred stock of the par value of $750,000 which is the amount of full interest for the period from the old effective date to the new. Their claim, based upon the reduction in Federal tax accruals for one year, is without merit. Such a reduction benefits all participating groups but it would not seem to require any change in distribution under the plan.

The Institutional Investors Group, the Savings Bank Group, the Reconstruction

Finance Corporation, the Trustee under the General Mortgage, the Trustees under the Fifty Year Mortgage and Mr. Abrams, representing the holders of certain Adjustment Mortgage Bonds, all expressed definite approval of the Modified Plan and no objections to the Modified Plan were filed by the Milwaukee & Northern Groups or the Terre Haute Groups.

### Court's Conclusions as to Compensation to Senior Bondholders.

On the question of compensation to senior bondholders the Court has noted the following from the decision of the Supreme Court of the United States in 318 U.S. 523, 63 S.Ct. 727, 749, 87 L.Ed. 959:

"A requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process. See Bourne, Findings of 'Value' in Railroad Reorganizations, 51 Yale L.Journ. 1057. It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received 'full compensatory treatment' rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts."

After a consideration of the record and the discussion of the Commission with reference to the compensatory treatment of the rights of senior creditors, the Court is of the opinion that the Commission, in the Modified Plan now under consideration, has fully met the requirements laid down by the Supreme Court and the Court agrees with the Commission that the provisions which are set forth in the Modified Plan, and which have been discussed briefly in this Opinion, make full and adequate compensation to all senior bondholders and, at the same time, provide an equitable distribution of the cash accumulated from war time earnings.

### Corrections and Clarifications.

The Trustees of the Debtor have proposed two clarifications in the Modified Plan and no objection has been made to either of them. As heretofore pointed out, the Modified Plan provides for a payment in cash of certain unpaid interest on General Mortgage Bonds which accrued prior to January 1, 1939. It seems that certain of the General Mortgage Bonds of each series are Registered Bonds and others are Coupon Bearer Bonds. By reason of the difference in interest payment dates, slightly more interest accruing prior to January 1, 1939, was paid upon the Registered Bonds than upon the Coupon Bonds with the result that the distribution under the Modified Plan as between the two types of bonds will vary correspondingly. The basis of exact computation is set out in the plan itself but, in order that bondholders may be advised as to this variation, the Court believes that there should be added a marginal note to paragraph 6 of Part L of the Modified Plan which note shall read as follows:

"Some of the outstanding General Mortgage Bonds of all series are Registered Bonds and others are Bearer Coupon Bonds. The interest on the Registered Bonds of all series is payable quarterly and on the Coupon Bonds, semi-annually. For the period prior to January 1, 1939, the latest due date of any interest paid pursuant to Court orders on the Coupon Bonds is July 1, 1936, whereas the latest due date of any interest paid pursuant to Court orders on the Registered Bonds is October 1, 1936. The payment to Registered Bondholders was, therefore, correspondingly larger, which necessitates a compensating adjustment in the distribution as between the holders of Coupon Bonds and Registered Bonds. The figures used in stating the approximate distributions are the average for the two types of bonds."

At the time the plan of June 4, 1940, was before the Court, at the suggestion of the Trustees there was added to the portion of the plan corresponding to the last paragraph of Part H, Section 1(b) of the Modified Plan the following sentence:

"However, in case the accounting rules now in effect are changed, they shall not operate to reduce the amount of funds available for additions and betterments be-

low the amount which would be available under an application of existing accounting rules."

This clarification was approved by the Commission in its Order of December 6, 1943. The sentence was added in anticipation of a possible change in accounting rules with reference to retirement accounting. Since that time the change has been made and, in order to carry out the intention of both the Court and the Commission at the time the original clarification was approved, it is now necessary to make that clarification speak as of the date of the former plan of June 4, 1940. To do that the sentence quoted should be amended to read:

"Provided, however, that changes in the accounting rules prescribed by the Interstate Commerce Commission made effective after June 4, 1940, shall not operate to reduce the amount of funds available for additions and betterments below the amount which would be available under an application of the rules existing on said date."

The Institutional Investors Group suggests that to insure negotiability of the new bonds some clarification may be necessary in connection with the escape clause provision in the Modified Plan which provides that the new First Mortgage shall contain a provision in such form and substance as may be determined by the Reorganization Committee, with the approval of the Court, that the mortgage may, with the approval of the Commission or other regulatory body having jurisdiction, be modified by the concurrent action of the reorganized company and the holders of not less than 75% in principal amount of the outstanding bonds so as to postpone the time or times of payment of the principal or interest. The provision as modified by the Commission on April 10, 1944, contains a definite limitation of twenty years for extending the payment of principal and, in the case of interest, five years but in no event beyond the ultimate maturity date of the principal.

It has been suggested that this provision might still render the new bonds non-negotiable. It was undoubtedly the view of the Commission that the provision would not have that effect. The parties in interest who have expressed themselves are anxious to avoid any possible non-negotiability and the Court concurs in that

view. However, the Court, after a consideration of the question, concludes that the proposed provision in the new Mortgage would not render the bonds non-negotiable. The Court is aware that there is some conflict in the authorities as to the effect of a provision for extension of the maturity date. A number of authorities upon the point are collected in a note appearing in 77 A.L.R. 1085. Other cases bearing upon the point are Anniston Loan & Trust Co. v. Stickney, 108 Ala. 146, 19 So. 63, 31 L.R.A. 234; West Texas Loan Co. v. Montgomery, 27 N.M. 296, 200 P. 681; McClenathan v. Davis, 243 Ill. 87, 90 N.E. 265, 27 L.R.A.,N.S., 1017. The clear weight of authority appears to support the view that a provision for extension of time by agreement between the parties to a negotiable instrument does not impair negotiability. In this case, while the proposed provision does not require agreement as between the maker of the bonds and of all of the holders, it does require the assent of 75% of the holders which means that those who become bondholders under a mortgage carrying this provision agree in advance to be bound by the decision of three-fourths of their number. In addition to that, there is a definite limit of time beyond which the maturity date cannot be extended so that it cannot be said that the ultimate maturity date cannot be determined. The fact is that such indentures usually contain provisions for control by a majority of security holders in certain respects, such as provisions permitting a stated percentage of holders to waive defaults and control the choice of remedies by the Trustee. Acceleration provisions are quite common. There is the further consideration that the plan provides that the form and substance of the provision to be inserted in the new mortgage shall be determined by the Reorganization Committee with the approval of the Court and certainly, when the time arrives to prepare the new First Mortgage, it will be possible to draw a provision which will not affect the negotiability of the bonds. The Court, therefore, feels that no clarification of the plan upon this point is necessary.

There is one provision of the Modified Plan which the Court feels is not desirable and constitutes a defect in the Plan. That is the provision to the effect that "the designation of any and of all of the Voting Trustees shall be sub-

ject to the approval of this Commission." This provision was not in former plans, and so far as the Court is advised was not requested by any party in interest in this proceeding. The Court assumes that its purpose is to enable the Commission to prevent the appointment of the same Voting Trustees in more than one railroad reorganization, where the same groups might represent substantial holdings. Such control as might be exercised in the management of the reorganized corporation would be exercised through its Board of Directors. Under existing law, Section 20a (12), Interstate Commerce Act, 49 U.S.C.A. § 20a(12), officers or directors of one carrier must obtain the authorization of the Commission before they can serve as officers or directors of another carrier. This provision would apply to those serving as directors of the reorganized corporation in this proceeding. The Court does not feel that the Commission needs any further control of the situation. Subdivision f of Section 77, Bankr.Act, 11 U.S.C.A. § 205, sub. f, provides that—

"Upon confirmation of the plan, the debtor and any other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, under and subject to the supervision and the control of the judge, the laws of any State or the decision or order of any State authority to the contrary notwithstanding."

The Court of jurisdiction would seem to be in better position to know the qualifications and fitness of those designated as Voting Trustees, and the same sources of information should be available to the Court as are available to the Commission. This provision in no way affects the capital structure of the plan or the distribution thereunder, but goes rather to what may be designated a mechanical feature. The Court considers it to be within its power, under the provisions of the plan itself, to correct this provision to provide that the designation of Voting Trustees shall be subject to the approval of the Court rather than the Commission and will, in its Order and Decree, make such provision. The Court finds support for its action in the Fifth Supplemental Report of the Commission in Finance Docket No. 10992, New York, New Haven & Hart-

ford Railroad Reorganization, made Feb. 8, 1944, following the decision of the Court of jurisdiction in that proceeding rendered December 21, 1943. D.C., 54 F.Supp. 595.

With the corrections and clarifications herein set forth, which the Court believes can be properly made within the framework of the plan itself, the Court concludes that the Modified Plan now before it complies with the provisions of Subsection b of Section 77 of the Bankruptcy Act, that the plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders, that the approximate amounts to be paid by the Debtor or by any corporation or corporations acquiring the Debtor's assets for expenses and fees incident to the reorganization have been fully disclosed, so far as they could be ascertained at the date of the hearing, are reasonable, are within such maximum limits subject to the approval of the Court, which approval is hereinafter stated, that the Plan provides for the payment of all costs of administration and all other allowances made or to be made by the Court, and that all of the statutory prerequisites to the approval of the Modified Plan, as certified by the Interstate Commerce Commission in its Order of April 10, 1944, have been met, and the said Modified Plan, with the corrections and clarifications stated, is approved.

### Allowances.

The Commission, by its Report of April 29, 1944, fixed maximum allowances for all claimants for the period from May 16, 1940, to August 31, 1943, both inclusive. At the hearing, Counsel for the Trustees and all claimants represented there agreed to submission of the question of allowances upon the record made before the Examiner for the Interstate Commerce Commission, a transcript of which has been certified to this Court.

The Court believes that the maximum allowances fixed in the Commission's Report are supported by the record and is not disposed to reduce the individual allowances below the maximum amounts so fixed and will, therefore, allow to each claimant for said period an amount equal to

the maximum limit fixed by the Commission for such claimant. As to any claimant for whom a maximum allowance of "nothing" was fixed, no allowance will be made.

Except to the extent that proposed corrections and clarifications are approved herein, all objections to the Modified Plan will be overruled and said Modified Plan approved as stated above and fees and expenses will be ordered paid in accordance with the allowances approved as set forth in this Opinion.

Counsel for the Trustees will prepare appropriate Findings, Conclusions of Law and Orders and Decrees to conform to this Opinion and submit the same to the Court at ten a. m. on June 30, 1944.