## In re ALABAMA, TENNESSEE & NORTHERN R. CORPORATION.

### No. 4833.

District Court, S. D. Alabama, S. D.

Sept. 15, 1942.

696

Armbrecht, Inge, Twitty & Jackson, of Mobile, Ala. (Thomas E. Twitty and Wm. H. Armbrecht, Jr., both of Mobile, Ala., of counsel), for the debtor's trustee and the debtor.

Cook, Nathan, Lehman & Greenman, of New York City (I. Howard Lehman and Thos. Epstein, both of New York City, of counsel), consulting counsel for the debtor's trustee.

Carter, Ledyard & Milburn, of New York City (Allin H. Pierce and Edward F. Clark, both of New York City, of counsel), for Manufacturers Trust Co. and James F. McNamara, trustees.

Davies, Auerbach, Cornell & Hardy, of New York City, and Smith, Hand & Arendall, of Mobile, Ala. (Louis F. Schwartz, Jr., of New York City, and Harry H. Smith and Chas. B. Arendall, Jr., both of Mobile, of counsel), for Irving Trust Co. and George E. Warren, trustees.

Emmet McCaffery, Counsel, Russell L. Snodgrass, Asst. Gen. Counsel, and Claude E. Hamilton, Jr., Gen. Counsel, all of Washington, D. C., for Reconstruction Finance Corporation.

William S. Pritchard and Winston B. McCall, both of Birmingham, Ala., and Satterlee & Warfield, of New York City, for Roy Gridley & Co.

William J. Kane, of Baltimore, Md., for Railroad Credit Corporation.

Donald J. Sherbondy, Counsel, of Washington, D. C. (Edward H. Foley, Gen. Counsel, of Washington, D. C., of counsel), for United States Treasury Department.

ERVIN, District Judge.

On May 11, 1942, this Court took under advisement the matter of the approval or disapproval of the Plan of Reorganization of the Alabama, Tennessee and Northern Railroad Corporation certified to it by the Interstate Commerce Commission, and also the objections to the Plan of Reorganization and claims for equitable treatment filed herein by the Trustees of the Debtor's Prior Lien Mortgage of October 15, 1918, and the Trustees of the Debtor's General Mortgage of October 15, 1918. I have concluded that said objections and claims for equitable treatment should be overruled and denied, and that said Plan of Reorganization should be approved. Therefore, pursuant to Subsection e of Section 77 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205, sub. e, I am filing this opinion stating my conclusions and my reasons therefor.

On December 14, 1934 the Debtor, a Railroad Corporation within the meaning of Section 77, subject to the territorial jurisdiction of this Court, being in financial distress, filed with this Court its petition for reorganization. On the same date this Court approved said petition as properly filed and appointed John T. Cochrane Trustee of the Debtor. After due notice and hearing, the appointment of said John T. Cochrane was made permanent and he continued to serve as Trustee of the Debtor until his death on January 12, 1938. Following the death of John T. Cochrane, and after due notice and hearing, this Court, on February 2, 1938, appointed John T. Cochrane, Jr., as substitute Trustee of the Debtor. Mr. Cochrane, Jr., has, as such Trustee, continued to operate the Debtor's property subject to the control and direction of this Court.

The Debtor's Trustee on October 9, 1935, filed with this Court a list of the stockholders, bondholders and creditors containing the information required by Statute. This list was supplemented by a list filed by the Debtor's Trustee on October 11, 1935.

The first Plan of Reorganization was filed by the Debtor in August, 1935. Within a few months the Debtor filed an amended plan upon which a hearing was held before two Examiners of the Bureau of Finance. During the month of June, 1937, the Bureau of Finance released a report proposing a plan based upon, but somewhat different, from the Debtor's amended plan. Many objections to the Bureau's report were filed by various parties including the Debtor. Then followed a period during which the interested parties endeavored to adjust their divergent views and to arrive at some plan under which all creditors and stockholders would be allowed to participate in the reorganization. But before such a plan could be agreed upon, the United States Supreme Court rendered its decision in the case of Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, holding that the rule of absolute priority must be applied in all reorganization cases. Guided by this case, the Debtor's Trustee drafted a completely new plan in which it was proposed for the first time that the priorities or rank of the respective classes of claims be maintained, that the General Mortgage bondholders be given a small amount of common stock, and that the general creditors and the preferred stockholders be wiped out.

A hearing was held on the Trustee's Plan before an Examiner of the Interstate Com-

merce Commission on February 28, 1940. Thereafter briefs in support of the Trustee's Plan and objections with supporting briefs were filed with the Interstate Commerce Commission. After seven months' consideration, the Bureau of Finance of the Commission released its report recommending a plan substantially the same as the Trustee's Plan except that the Bureau found that there was no equity in the Debtor's property for the Debtor's General Mortgage bondholders, and denied them any participation in the securities to be issued by the reorganized Company. Exceptions to the Bureau's report and supporting briefs were thereupon filed by all parties who had intervened in the proceedings before the Interstate Commerce Commission. The parties were then permitted to argue their objections orally before Division 4 of the Commission which took the matter under submission, releasing its first report and plan on June 25, 1941.

The only parties who objected to the Commission's report and plan of June 25, 1941, were Reconstruction Finance Corporation and the Trustees under the Debtor's General Mortgage of October 15, 1918. However, after the report and Plan of June 25, 1941, were filed it developed that the Reconstruction Finance Corporation was unwilling to lend the reorganized Company the new capital which it was then thought would be needed. In order to overcome the effect of this unforeseen development, a stipulation was filed with the Commission proposing certain modifications for the purpose of conserving the cash on hand and reducing the immediate cash requirements of the reorganized Company. This stipulation was signed by counsel of record for all parties of record before the Commission except counsel for the General Mortgage Trustees.

On March 3, 1942, the Commission filed its report and order modifying its report and plan of June 25, 1941, substantially as suggested in said stipulation.

Pursuant to Section 77, sub. d, of the Bankruptcy Act, as amended, the Commission, on March 3, 1942, certified to this Court its modified approved Plan of Reorganization (hereinafter referred to as the "Plan"), its reports and orders of June 25, 1941, and March 3, 1942, and a complete transcript of the proceedings and record before it in this case. This Court thereupon entered its order, dated March 28, 1942, fixing the time within which objections to the Plan and claims for equitable treatment might be filed herein, fixing the time within which claims might be filed for expenses and fees incident to the reorganization, fixing May 11, 1942, as the date for the hearing of said objections and claims, and providing for the giving of due notice to creditors, stockholders and all other parties in interest by the Debtor's Trustee. Notice of the entry of said order of March 28, 1942, was given by the Debtor's Trustee in accordance with the directions of this Court contained in that order. And pursuant to said order, objections to the Plan and claims for equitable treatment were filed by and on behalf of the Trustees of the Debtor's Prior Lien Mortgage of October 15, 1918, and the Trustees of the Debtor's General Mortgage of the same date. Reconstruction Finance Corporation filed a claim for equitable treatment and statement of position stating that while not in all respects satisfied with the treatment of its claim under the plan, it requested, in view of the desirability in the public interest of prompt reorganization of this and other railroads, that the plan be approved by the Court and consummated at an early date.

As required by said order of March 28, 1942, petitions for allowance of fees and expenses were filed by Manufacturers Trust Company, Trustees of the Debtor's Prior Lien Mortgage; Carter, Ledyard & Milburn, counsel for said Trustee of the Debtor's Prior Lien Mortgage; Irving Trust Company and George E. Warren, Trustees of the Debtor's General Mortgage; Davies, Auerbach, Cornell & Hardy, counsel for said Trustees of the Debtor's General Mortgage; Smith, Hand & Arendall, local counsel for the Trustees of the Debtor's General Mortgage; Reconstruction Finance Corporation; the Trustee of the Debtor; Armbrecht, Inge, Twitty & Jackson, attorneys for the Debtor's Trustee; Cook, Nathan, Lehman & Greenman, consultant counsel for the Debtor's Trustee; Marine Midland Trust Company; Roy Gridley & Company, one of the intervenors in this proceeding and the holder of a small amount of the Debtor's Prior Lien Mortgage bonds; William S. Pritchard and Winston B. McCall, as counsel for Roy Gridley & Company; and Satterlee & Warfield, as associate counsel for Roy Gridley & Company. These petitions were referred to the Commission for the purpose of fixing maximum limits for such allowances. After a hearing in which testimony was presented with respect to such petitions, the Commission, on

August 11, 1942, made its report and order fixing such maximum limits. A certified copy of this report and order of the Commission have been filed with this Court and are a part of the record before me.

On May 11, 1942, a hearing was held by this Court in which all parties in interest were afforded an opportunity to be heard in support of and in opposition to such objections and claims for equitable treatment. At that hearing counsel for the Trustees of said Prior Lien Mortgage and counsel for the Trustees of said General Mortgage appeared and argued in support of the respective objections of the mortgage trustees. Counsel for Reconstruction Finance Corporation and counsel for the Debtor's Trustee appeared and argued in support of the Plan.

The Debtor's income accounts for the years ending December 31, 1940, and December 31, 1941, and the income accounts for the months of January, February and March, 1942, were introduced in evidence by the Trustees of the Debtor's General Mortgage at the hearing of May 11, 1942. Said Trustees also introduced in evidence the cash balance of the Debtor's Trustee as of April 30, 1942, as well as the statement of the Debtor's current assets as of March 31st.

The Trustees of the Debtor's Prior Lien Mortgage and the Trustees of the Debtor's General Mortgage have taken an active part in these proceedings both in this Court and before the Interstate Commerce Commission. Each of said Trustees has given careful thought and study to the various plans presented to the Commission, the reports and plan of the Commission and Examiners for the Commission, and all other matters pertaining to the reorganization of the Debtor. At each stage of the proceeding said Mortgage Trustees, without committing their bondholders, have forcefully and clearly presented to the Commission and now to this Court, all objections of any consequence which might have been presented by the bondholders themselves or by a committee representing the bondholders.

Thus it is apparent from the foregoing statement of the proceedings to date that all parties in interest have had ample opportunity to be heard, and that the interests of all classes have been adequately represented and have had their claims presented and argued both to this Court and the Commission. It is also apparent that Division 4 of the Commission, which devotes its entire time and efforts to financial problems of railroads, has given much thought and study to the problems involved in the reorganization of the Debtor and especially to the matter of the value of the Debtor's property for the purpose of reorganization.

In passing upon the approval or disapproval of the Plan of Reorganization certified to this Court by the Commission, and the objections thereto and claims for equitable treatment, I have considered not only the testimony and evidence offered at the hearing on May 11, 1942, but also the evidence and facts contained in the entire record in this proceeding, including the transcript of the proceedings before the Commission, and I have concluded that the findings of fact and conclusions of the Commission in its original report of June 25, 1941, as modified by its supplemental report of March 3, 1942, are fully supported by the evidence and are correct. I have also concluded and am satisfied that the Plan complies with the provisions of Subsection b of Section 77 of the Bankruptcy Act, as amended; that it is fair and equitable; affords due recognition to the rights of each class of creditors and stockholders; does not discriminate unfairly in favor of any class of creditors and stockholders; and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; that the approximate amounts to be paid by the Debtor or by any corporation or corporations acquiring the Debtor's assets for expenses and fees incident to the reorganization have been fully disclosed so far as they can be ascertained, are reasonable, are within such maximum limits as have been fixed by the Commission, and are within such maximum limits to be subject to the approval of this Court; that the Plan provides for the payment of all costs of administration and all other allowances made or to be made by this Court; that it includes provisions modifying or altering the rights of classes of secured creditors of the Debtor through the issuance of new securities or otherwise; that it provides for fixed charges (including fixed interest on funded debt, interest on unfunded debt, and amortization of discount on funded debt) in such an amount that after due consideration of the probable prospective earnings of the property in the light of its earnings experience and all other relevant facts, there will be adequate coverage of such fixed charges by the probable earnings available

for the payment therefor; that it provides adequate means for its execution; that unsecured claims which would have been entitled to priority if a receiver in equity of the property of the Debtor had been appointed by a Federal Court on the day of the approval of the petition will be given such priority and the holders of such claims will be treated as a separate class or classes of creditors; and that in all other respects it complies with the provisions of Section 77 of the Bankruptcy Act, as amended.

The present financial structure of the Debtor is relatively simple, the Debtor's funded debt being as follows:

| | |
|---|---|
| Prior Lien 6% Bonds due 1948 in the hands of the public | $1,672,860 |
| Loan from United States due 1931 to 1936; secured by Equipment Trust Certificates and by $77,000 principal amount of Debtor's Prior Lien Bonds | 151,500 |
| Loan from Reconstruction Finance Corporation due 1935 and secured by a pledge of $515,000 of Prior Lien Bonds | 185,000 |
| General Mortgage 6% Bonds due 1948 in the hands of the public | 1,959,429 |
| Preferred Stock | 1,509,780 |
| Common stock | 24,068 |
| | $5,502,637 |

Interest accrued and unpaid as of January 1, 1942 (the effective date of the Plan), on the outstanding Prior Lien Bonds, including those pledged to Reconstruction Finance Corporation amounted to approximately $1,000,378, and interest accrued and unpaid on notes held by the United States Treasury amounted to approximately $73,465. Thus the Debtor's total capitalization, including interest accrued and unpaid to January 1, 1942 on the Prior Lien Bonds and the United States Treasury note, but excluding interest on the General Mortgage Bonds and other obligations of the Debtor, amounted, on January 1, 1942 to $6,576,480.

Based upon a careful study of the Debtor's past, present and prospective earnings, the loss of traffic to competing modes of transportation, the increased cost of operations, the decline in timber in the territory served by the Debtor, the investment in the Debtor's properties, the physical valuation of the property on a cost of reproduction less depreciation basis, and all other relevant factors affecting the value of the Debtor's properties, the Commission found that the total value of the Debtor's property for the purpose of the reorganization proceeding does not exceed $3,575,000. The Commission's finding in its Supplemental Report of March 3, 1942 being as follows:

"Considering all of the factors, we are of the view that the value of the property for the purpose of this proceeding is not in excess of $3,575,000, the amount heretofore fixed as the capitalization of the reorganized Company." (Supp. Report, page 4).

■ This is a definite finding of fact as to the value of the Debtor's property for the purpose of reorganization. It is supported adequately by the evidence and the record before the Commission and this Court and is correct.

The Plan authorizes the Debtor to obtain a maximum of $261,797 of new money to meet the cash requirements in excess of such as may be available therefor in the hands of the Debtor's Trustee at the time of reorganization. Such new money will be obtained either through the issuance and sale at par in reorganization of new 25-year 4% First Mortgage Bonds or through a short term 5-year loan to be evidenced by the new or reorganized Company's notes and secured by a pledge of an equal face amount of said new First Mortgage Bonds. If such financing is done through the medium of notes, they will be payable in equal annual installments over a period of five years but will provide that the reorganized Company may make additional principal payments on any interest payment date.

Deducting from the total authorized capitalization of $3,575,000 the $261,797 of new First Mortgage Bonds authorized to be issued in reorganization, there is left $3,313,203 to be apportioned among the respective classes of claims in accordance with the rule of strict priority laid down by the Supreme Court of the United States in the cases of Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; and Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

No objection has been made with respect to the treatment afforded the claim of the Treasury Department which holds the Debtor's note in the principal sum of $151,500, secured by a pledge of equipment trust certificates constituting a first lien upon 199 of the Debtor's railroad cars, a special deposit of $40,747.27 received from the sale during the pendency of the reorganization proceedings of 100 cars formerly secured by the same equipment trust, and a pledge of $77,000 of the railroad's Prior Lien Bonds. The 199 railroad cars securing said

Equipment Trust Certificates constitute substantially all of the Debtor's railroad cars. The United States Treasury also asserted a claim for rental for use of the cars and for depreciation charged on said cars by the Debtor's Trustee during the pending reorganization proceedings, claiming a right of priority with respect to said claim over all other claims. The Treasury under the plan is to receive, for all of its claims and collateral, $100,000 in cash and $124,965 of new Income Bonds; the amount of cash and Income Bonds to be delivered to the Treasury being equal to the principal amount of the notes held by it ($151,500) with accrued and unpaid interest thereon to January 1, 1942 in the sum of $73,465. The Debtor's notes held by the Treasury together with the Equipment Trust Certificates and Prior Lien Bonds collaterally securing said notes will be cancelled.

Next there may be considered the public holders of the Debtor's Prior Lien Mortgage Bonds of October 15, 1918, and the Reconstruction Finance Corporation, which holds the Debtor's matured and unpaid note in the principal sum of $185,000, secured by a pledge of $515,000 of the Debtor's Prior Lien Mortgage Bonds of October 15, 1918. The Debtor's Prior Lien Mortgage Bonds are secured by a first lien upon all of the Debtor's property except the cars covered by the equipment trust securing the notes held by the United States Treasury.

The total claim of the Prior Lien bondholders, excluding Reconstruction Finance Corporation and the Treasury Department, amounts to the sum of $2,492,988, consisting of $1,672,860 of principal and $820,128 of unpaid accrued interest to January 1, 1942. Under the plan, the holders of the actually outstanding Prior Lien Bonds in the hands of the public will receive, on account of principal and unpaid interest thereon to January 1, 1942, 50% of their claim, or $800 in new Second Mortgage Income Bonds for each $1,000 of Prior Lien Bonds with all interest coupons dated July 1, 1932, and subsequently attached, and for each $1,000 bond not accompanied by all such coupons, they will receive the same amount reduced by $15.00 for each semi-annual interest coupon not attached but heretofore surrendered in recognition of part payment in respect of interest thereon. Such holders also will receive 50% of their claim, or 8 shares in new common stock for each $1,000 bond with all interest coupons

dated July 1, 1932, and subsequently attached and for each $1,000 bond not accompanied by all such coupons the same amount of common stock reduced by 0.15 share for each semi-annual interest coupon not attached but heretofore surrendered in recognition of part payment in respect of interest thereon. The outstanding Prior Lien Bonds and Mortgage will be cancelled.

Reconstruction Finance Corporation, as the holder of the Debtor's outstanding secured notes in the principal sum of $185,000 upon which interest is due and unpaid to January 1, 1942, in the sum of $86,407, will receive a new 15-year 4% contingent note secured by a pledge of $347,625 of new Income Bonds and 3476.25 shares of new no-par value common stock. Interest on said note will be payable solely out of the interest payable on the Income Bonds thus pledged and dividends declared on the pledged stock. Should interest payable on the pledged bonds and dividends paid on the pledged stock exceed the amount necessary to pay all unpaid interest at the rate of 4% per annum on the principal amount of the note outstanding, for the then current and all previous years, Reconstruction Finance Corporation will be required to apply the excess amount to the reduction of the principal amount of the note. The reorganized Company will have the right of making payments on account of this note at any time upon thirty days' notice. And at the maturity of the note, the reorganized Company may, at its option, either pay the note or any balance due thereon, and obtain said collateral, or satisfy the note by conveying to the holder thereof all of the reorganized Company's right in and to the collateral. The effect of the treatment thus afforded Reconstruction Finance Corporation is to give it a new 15-year 4% contingent interest note for the principal amount of its present note with interest to January 1, 1942, secured by new Income Bonds and common stock for the same amount as it would have received had it exercised its legal right to foreclose on the Prior Lien Bonds now pledged as collateral to the note now held by it. Should the reorganized Company be able to pay off the new note to Reconstruction Finance Corporation the new collateral will be returned. Should it fail to pay off the note, Reconstruction Finance Corporation's sole recourse will be to take possession of the new collateral.

The reorganized Company's capital structure upon reorganization will be as follows:

| | Principal | Charges |
|---|---|---|
| Fixed-charge obligations | | |
| First-mortgage 4% bonds or a note secured by such bonds, not exceeding | $ 261,797 | $ 10,472 |
| Sinking fund payment, 1% on bonds | | 2,618 |
| Total | $ 261,797 | $ 13,090 |
| Contingent obligations | | |
| Capital fund, 2½% of railway operating revenues ($1,000,000 estimated) | | 25,000 |
| Additions and betterments average payment for 5 years | | 15,000 |
| Second mortgage 4½% income bonds including $347,625 to be pledged as part security for contingent interest note of $271,407 to be given to the Finance Corporation | 1,719,084 | 77,359 |
| Total contingent-interest debt and charges | 1,719,084 | 117,359 |
| Total debt and charges | 1,980,881 | 130,449 |
| Common stock, no-par-value but taken at $100 a share, including $347,625 to be pledged as part security for the $271,407 note to be given to the Finance Corporation | 1,594,119 | |
| Total capitalization | $3,575,000 | |

Thus it is apparent that the above mentioned new securities exhaust the maximum valuation of $3,575,000.

█ The outstanding Prior Lien Bonds in the hands of the public and held by Reconstruction Finance Corporation plus the claim of the Treasury Department, including interest to January 1, 1942, amount to $3,409,680, which sum is not much less than the maximum valuation fixed by the Commission. This sum excludes current liabilities, claims against the Debtor having priority and reorganization expenses and fees. It is impossible to fix a valuation with mathematical certainty, and the valuation fixed by the Commission was determined as a maximum value. Viewed in all of its aspects, the record shows that the General Mortgage bonds have no value, and the holders thereof for principal and unpaid interest can receive nothing. Likewise, the claims of the general creditors not entitled to priority in an equity receivership, and the interest of the Debtor's preferred and common stockholders are of no value and can receive nothing in the reorganization.

The Trustee's obligations and expenses of reorganization are to be paid in cash and the following claims are to be paid in cash or assumed by the reorganized Company: (1) current liabilities of the Debtor, incurred in the ordinary conduct of its business prior to the institution of the reorganization proceedings, which would be entitled to priority in an equity receivership and which are entitled to priority over the mortgages of the Debtor; (2) current liabilities and obligations of the Debtor's Trustee incurred during the reorganization proceedings; and (3) taxes.

The new First Mortgage will have a first lien on all of the properties and assets owned by the reorganized Company at the consummation of the Plan, and also will have a lien subject only to the lien existing at the time of acquisition, on all appurtenant property including equipment, acquired by the reorganized Company after reorganization, and on all property, whether appurtenant or not which may be acquired in whole or in part by the issuance of First Mortgage Bonds.

The amount of bonds issuable under the new First Mortgage will be limited to a maximum principal amount of $611,797 at any one time outstanding pledged and unpledged. As long as any of the secured notes issued in reorganization for new money are outstanding the maximum principal amount of new First Mortgage Bonds of the reorganized Company which may be outstanding at any one time in addition to such bonds as may be pledged as security for such notes will not exceed $350,000, and no such additional First Mortgage Bonds may be issued without the prior consent of the holders of the notes as long as the notes are outstanding.

First Mortgage Bonds Series A may be issued in reorganization to the extent necessary but not exceeding $261,797 to obtain new money either directly or through their pledge as collateral for notes. Such bonds will bear interest at the rate of 4% per annum and will mature January 1, 1967.

First Mortgage Bonds in addition to those to be authenticated in reorganization may, within the limits hereinabove referred to and with the requisite approval of public regulatory authority, be authenticated from time to time (a) to the extent such bonds are refunded or redeemed, to refund or redeem outstanding or pledged First Mortgage Bonds other than bonds acquired for the sinking fund for all First Mortgage Bonds

or for any additional sinking fund or funds in connection with such bonds issued for equipment, or (b) for not exceeding 75% of the net cost, not otherwise financed, of additions, extensions, betterments, improvements, locomotives or rolling equipment, machinery and implements. However, if any bonds are issued for rolling equipment, a sinking fund additional to and to be applied in the same manner as, the sinking fund for all First Mortgage Bonds shall be established payable in equal annual installments in an amount sufficient to retire at par within the expected efficient service life of such equipment (in no case to exceed 15 years) a principal amount of First Mortgage Bonds equal to the principal amount of the bonds so issued for equipment.

The new Second Mortgage will constitute a lien subject to the lien of the First Mortgage and next in order upon all property from time to time subject to the lien of the First Mortgage. The Second Mortgage will contain covenants permitting the extension of the First Mortgage Bonds without change of lien.

Second Mortgage Income Bonds without limit as to aggregate amount, or within such limits as may be specified in the mortgage or prescribed by the laws of the State in which the reorganized Company shall be incorporated, shall, with the requisite approval of public regulatory authority, be issuable from time to time in different series. No interest will be mandatorily payable on Second Mortgage Income Bonds issued in reorganization (except at maturity or on redemption) other than out of available net income.

Second Mortgage Income Bonds Series A will be issued in exchange in reorganization in the amount of approximately $1,371,-459, and in addition $347,625 of such bonds shall be authenticated and pledged with the Reconstruction Finance Corporation as heretofore stated. Such Series A Second Mortgage Income Bonds will be dated January 1, 1942, will mature January 1, 1992, will bear contingent interest at the rate of 4½% per annum, and will be redeemable in whole or in part by lot on any interest payment date on thirty days' notice at the principal amount and all unpaid interest accumulated for prior years and interest at the rate of 4½% per annum from the last preceding December 31st to the redemption date.

Interest on the new Second Mortgage Income Bonds will be mandatorily payable only out of the available net income of the reorganized Company that remains after providing for (1) the capital fund; (2) additions and betterments not to exceed a total of $75,000 during the first five years nor more than $25,000 in any one year; (3) sinking funds mandatorily payable and (4) an excess of $100,000 of current assets over current liabilities.

In no event will interest be payable on the Series A Second Mortgage Income Bonds unless the current assets of the reorganized Company exclusive of the capital fund and the First Mortgage sinking funds, at the end of the next preceding calendar year, shall exceed the current liabilities by not less than $100,000.

All interest which becomes due and that is not paid on the following May 1st will accumulate up to the maximum amount of 13½% and not beyond. No contingent interest on Series A Second Mortgage Income Bonds will be paid if the amount so paid will be less than ¼ of 1%; and all payments shall be in multiples of ¼ of 1%, any excess available for interest not paid because of this provision being reserved and added to the amount of available net income determined for the next succeeding income period.

Available net income will be determined for each calendar year by deducting fixed charges, including all sinking fund payments for First Mortgage Bonds, from income available for fixed charges determined in accordance with the accounting rules of the Commission or other analogous Federal authority having jurisdiction in the premises, or to the extent not governed by such accounting rules, in accordance with sound accounting practice. If in respect of any year there shall be a deficit in available net income the amount of such deficit shall be carried forward and be deducted in determining available net income for the succeeding calendar year or years until such deficit, or accumulated or remaining deficits, are extinguished by earnings which, in the absence of such deficit or deficits would be available net income.

Approximately 12,464.94 shares of no-par value common stock will be issued in reorganization to the public holders of the outstanding Prior Lien Bonds. In addition approximately 3,476.25 shares will be issued and pledged with Reconstruction Finance Corporation as collateral security for its new note; the shares so pledged be-

704

ing treated as though actually outstanding for dividend and voting purposes.

Holders of common stock will be entitled to one vote a share on all matters.

This brings me to a consideration of the objections to the Plan and claims for equitable treatment. Manufacturers Trust Company, successor Trustee of the Debtor's Prior Lien Mortgage, objects to so much of the Plan as provides that the $800 in new Second Mortgage Income Bonds and 8 shares of new common stock to be issued in respect of each $1,000 Prior Lien Bond and accrued interest shall be reduced to the extent of $15 of principal amount of Second Mortgage Income Bonds and to the extent of .15 shares of common stock for each semi-annual interest coupon dated on or after July 1, 1932, not attached but heretofore surrendered in recognition of part payment.

As of June 15, 1932, the Debtor and the holders of $1,537,800 of the $1,672,860 of the Debtor's Prior Lien Bonds then in the hands of the public entered into a forbearance agreement by the terms of which the holders of said $1,537,800 of Prior Lien Bonds surrendered the semi-annual interest coupons maturing July 1, 1932, January 1, 1933, and July 1, 1933, having an aggregate face value of $90 per bond for $15 in cash. In addition said Prior Lien Bondholders agreed to reduce interest from July 1, 1933, to and including June 30, 1935, from 6% to 4% per annum thereby reducing the face amount of each semi-annual interest coupon maturing January 1, 1934, through July 1, 1935, from $30 to $20. The January 1, 1934, coupon on all deposited bonds was paid at the reduced rate of $20. Thus the Prior Lien Bondholders who entered into said forbearance agreement received a total of $35 in cash for four semi-annual interest coupons having a face value of $120. For the same four coupons the non-depositing bondholders have received nothing.

Article Fifth of said Deposit Agreement of June 15, 1932 provides as follows:

"Fifth: The Railroad Corporation will not cancel or utilize the coupons detached from the Prior Lien Bonds presented to the Manufacturers Trust Company for surrender or exchange of coupons as herein provided but will cause such coupons to be retained in the custody of said Trust Company for safekeeping and in the event that for any reason there shall be a foreclosure of the Prior Lien Mortgage or the appointment of a Receiver for the Railroad Corpo-

ration, then and only in any such case the detached coupons shall be deemed to have been kept alive for and shall inure to and for the benefit of the holders of the respective Prior Lien Bonds from which the same were detached to the extent of the face amount thereof less the payment hereinabove in Clause 'Fourth' provided and the amount which shall theretofore have been paid on the new coupons issued in exchange therefor hereunder."

It is apparent from the wording of the above quoted Article that the coupons detached from the Prior Lien Bonds presented to Manufacturers Trust Company under the Agreement of June 15, 1932, were to be kept alive only in the event of a foreclosure of the Prior Lien Mortgage or the appointment of a receiver for the Railroad Corporation. Neither event has occurred. This proceeding is for the reorganization of the Debtor under Section 77 of the Bankruptcy Act, as amended. Pursuant to said Act a Trustee has been appointed. The appointment of a Trustee in Bankruptcy under Section 77 of the Bankruptcy Act does not constitute the appointment of a receiver for the Debtor within the meaning of the above quoted Article of said Agreement.

But aside from the question of whether there has been a foreclosure or appointment of a receiver within the intent and meaning of the above quoted Article of June 15, 1932, I do not think it inequitable to require the Prior Lien Bondholders who deposited their bonds under said Agreement to relinquish $60 in new Second Mortgage Income Bonds and .60 shares of new common stock for the $35 which they received in cash a number of years ago. The payment of $15 in cash in 1933 and $20 in cash in 1934 is at least the fair equivalent of $60 in new Income Bonds and .60 shares of new common stock. The present market price of the Debtor's Prior Lien Bonds with all coupons attached (constituting a total claim of $1,600) is not over 27 flat as appears from the testimony given by the Debtor's Trustee at the hearing on May 11, 1942. Therefore, if a depositing Prior Lien Bondholder had his $120 of surrendered coupons his claim on said coupons would be worth in today's market a little less than $20, and he has received for said coupons $35 in cash.

Manufacturers Trust Company further objects to the Plan upon the ground that it is not clear whether the Prior Lien Bond-

holders who deposited their bonds under an agreement dated June 26, 1934, are to receive new securities for July 1, 1934, and subsequently maturing coupons. Pursuant to said agreement there has been stamped on the face of each deposited bond a legend to the effect that the coupons maturing July 1, 1934, and January 1, 1935, should be extended to July 1, 1939, and that payment of interest on and after July 1, 1935, should be upon an income basis. All of the old coupons maturing on and subsequent to July 1, 1934, have been detached from the bonds deposited under this Agreement and a new sheet of income interest coupons has been attached. No interest payment whatever has been made in respect to these coupons.

■ I think it clear that the surrender of the coupons under the Deposit Agreement of June 26, 1934 will not reduce the new securities to be received in reorganization by such depositing bondholders. The Plan provides that the amount of new Second Mortgage Income Bonds to be received in reorganization by the holders of actually outstanding Prior Lien Bonds shall be "reduced by $15 for each semi-annual interest coupon not attached but heretofore surrendered in recognition of *part* payment in respect of interest thereon", and that the amount of new stock to be received by said Prior Lien Bondholders shall also be "reduced by 0.15 share for each semi-annual interest coupon not attached but heretofore surrendered in recognition of *part* payment in respect of interest thereon". There has been no interest whatever paid on the coupons detached and surrendered under the Agreement of June 26, 1934.

Irving Trust Company and George E. Warren, as Trustees under the Debtor's General Mortgage of October 15, 1918, object that the Plan is unfair and inequitable to the General Mortgage Bondholders, discriminates unfairly against them, fails to conform to the law of the land regarding participation of parties in a reorganization plan, would, if carried out, constitute a taking of the property of said bondholders without just compensation and would deprive them of their property without due process of law. In support of this objection, the General Mortgage Trustees assign the following reasons:

1. The statement contained in the Commission's modified report of March 3, 1942, page 4, that "considering all of the factors, we are of the view that the value of the property for the purpose of this proceeding is not in excess of $3,575,000, the amount heretofore fixed as the capitalization of the reorganized company", is not such a determination of value of the Railroad's property and certification of such value to the Court as are required by Section 77, sub. e, of the Bankruptcy Act, as amended. It does not give due consideration to the earning power of the Railroad's property past, present and prospective, nor to the present cost of reproduction new and less depreciation, and original cost of the property and the actual investment therein, as "required under the law of the land".

2. The plan makes its effective date January 1, 1942, instead of some other date substantially earlier than January 1, 1942, thereby resulting in the proposed capitalization in new securities of a large amount of accrued interest for the benefit of prior claimants and lienors, thus depriving the General Mortgage Bondholders of an equivalent amount in the capitalization of the new company.

3. The proposed new First Mortgage Bonds to be issued in reorganization should not exceed $100,000, which is the amount that counsel of record for all parties except counsel for the General Mortgage Trustees stipulated might be borrowed in reorganization for the purpose of meeting the cash requirements that could not be paid out of cash on hand at the time of reorganization.

4. The treatment proposed for Reconstruction Finance Corporation is unfair to the General Mortgage Bondholders in that it would unduly increase the capitalization of the reorganized Company at their expense; the suggestion of the General Mortgage Trustees being to give Reconstruction Finance Corporation the principal amount of its loan ($185,000) in Second Mortgage Income Bonds having a prior claim upon income and the amount of accrued interest on its loan in Second Mortgage Bonds without a prior claim upon income. The General Mortgage Trustees also suggest that if the awarding of securities to Reconstruction Finance Corporation provided for in the Plan is to be approved, provision should be made for the restoration to the General Mortgage Bondholders of the equity in the Finance Corporation's new collateral upon payment or reduction of the Finance Corporation's new note.

The plight of the General Mortgage Bondholders excites my sympathy, but we

must not let our sympathy for these bondholders cause us to forget the rights of those having prior claims, nor must we forget the interest that the public has in seeing that the Debtor's financial structure 'and position is such as to enable it to render satisfactory service. The unfortunate situation of the General Mortgage Bondholders is due not to the Plan but to the Debtor's financial condition. The objections of the General Mortgage Trustees will be discussed and disposed of seriatim.

■ The General Mortgage Bondholders are excluded from any participation in the reorganization upon the ground that their claim is of no value. There must therefore be a specific finding of fact by the Commission as to the value of the Debtor's property. In re Chicago, Milwaukee, St. P. & P. R. Company, 7 Cir., 124 F.2d 754; In re Western Pacific Railway, 9 Cir., 124 F.2d 136; Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 61 S. Ct. 675, 85 L.Ed. 982, and the following provisions of Section 77, sub. e, of the Bankruptcy Act, as amended:

"If it shall be necessary to determine the value of any property for any purpose under this Section, the Commission shall determine such value and certify the same to the Court in its report on the Plan".

The Commission, in its report of June 25, 1941, makes the following finding: "We accordingly find that the equities or interests of such security holders [General Mortgage Bonds] creditors and claimants have no value".

And in its supplemental report of March 3, 1942 the Commission makes the following finding: "Considering all of the factors, we are of the view that the value of the property for the purpose of this proceeding is not in excess of $3,575,000, the amount heretofore fixed as the capitalization of the reorganized Company".

■ The above findings by the Commission, which are contained · in the report certified to this Court, are a sufficient determination and finding of value.

The same contention with respect to the inadequacy of the Commission's finding of value was unsuccessfully made by stockholders in the Chicago, M., St. P. & P. R. Company case, supra. The finding by the Commission in that case was as follows [124 F.2d 763]: "We find that the equities of the holders of the Debtor's preferred stock and its common stock have no value and that the holders of claims in Classes 24 and 25, therefore, are not entitled to participation in the Plan".

In its supplemental opinion in the Chicago, M., St. P. & P. R. Company case, 131 F.2d 214, the Circuit Court of Appeals for the 7th Circuit said of this finding:

"It was, and is, our opinion that the I.C.C. made a sufficiently specific finding as to value of the equity represented by the common and preferred stock of the Debtor, so as to permit the court to intelligently review this issue, the determination of which is necessary to a disposition of the other questions presented by the reorganization plan.

"Now, to make our position entirely clear, we add this memorandum and hold that the finding of the I.C.C. as to absence of value of old common and preferred stock, is specific, definite and certain, and fully meets the rule which requires finding on values of assets."

Clearly, the findings of value in the present case (in which the Commission's supplemental report was rendered after the Chicago, M., St. P. & P. R. Company case) is as specific and definite as the above quoted finding in the Chicago, M., St. P. & P. R. Company case.

The General Mortgage Trustees place much emphasis upon the Commission's alleged failure to give due consideration to the present cost of reproduction new, less depreciation and original cost of the property and the actual investment therein as "required under the law of the land". Likewise, the General Mortgage Trustees claim that due consideration has not been given to the earning power of the Debtor's property past, present and prospective, particularly in view of the sharp increase in the Debtor's earnings during 1941 and the first three months of 1942.

With respect to the valuation of the Railroad properties in reorganization Section 77, sub. e, of the Bankruptcy Act provides as follows:

"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the Court in its report on the Plan. The value of any property used in railroad operation shall be determined on a basis which will give *due consideration to the earning power* of the property, past, present and prospective, and all other relevant facts. In determining such value *only* such effect shall be given to

the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, *in light of its earning power* and all other relevant facts."

■ It will be observed that the statute provides expressly and affirmatively that earning power shall be given "due consideration" and, negatively, that other factors shall be given "only such effect" as may be required "under the law of the land, in light of its earning power and all other relevant facts". Thus it is apparent that in the present proceeding the earning power of the property, past, present and prospective, is the factor which must be given primary consideration in determining the value of the Debtor's property, and that other factors may be considered only in so far as they bear upon that earning capacity.

■ This principle recently has been reaffirmed by the Supreme Court in Consolidated Rock Products Co. v. Du Bois, March 3, 1941, 312 U.S. 510, pages 525, 526, 61 S.Ct. 675, page 685, 85 L.Ed. 982, wherein it is said:

"Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a sine qua non to a determination of the integrity and practicability of the new capital structure. It is also essential for satisfaction of the absolute priority rule of Case v. Los Angeles Lumber Products Co., supra (308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110). Unless meticulous regard for earning capacity be had, indefensible participation of junior securities in plans of reorganization may result.

"As Mr. Justice Holmes said in Galveston, H. & S. A. Ry. Co. v. State of Texas, 210 U.S. 217, 226, 28 S.Ct. 638, 52 L.Ed. 1031, 'the commercial value of property consists in the expectation of income from it.' And see Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041. Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties. It is plain that valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity. Temmer v. Denver Tramway Co., 8 Cir., 18 F.2d 226, 229; New York Trust

Co. v. Continental & Commercial Trust & Sav. Bank, 8 Cir., 26 F.2d 872, 874. The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. * * * A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate."

Applying the foregoing principles to a railroad reorganization the 7th Circuit Court of Appeals in the case of In re Chicago, M., St. P. & P. R. Company, supra, said:

"Assuming as we must that the commercial value of Debtor's property consists in the expectation of income from it (Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041), there is no support for a finding of value in Debtor's preferred or common stock. Debtor's property being productive, valuations based on other than earning bases may be considered only as such valuations may bear on earning capacity. * * * This, (prospective income as basis of plan of reorganization), it seems to us, is the corner stone of a sound reorganization plan. What is the income upon which the new setup is to rest? This is the first question that must be answered. And the answer must be a dependable one. For meeting the obligations of the new company can not be left merely to hopes of favorable winds. A decade of indisputable statistics is available. The realization of expected earnings is essential to the future of the Debtor. Every dollar of value of Debtor should be allotted to its creditors (and, if the showing warranted it, to the stockholders), but there is neither justification for, nor satisfaction in, a plan which tomorrow brings only a harvest of barren regrets.

"No plan of reorganization (and for that matter, any original financing) can be justified, called safe, or sound, or honest, unless there is made provision, which has reasonable promise of fulfillment, for the meeting of corporate obligations, whether represented by notes or stock. Dependence on luck, unforeseeable future profits, or wild hopes is the first step toward bankruptcy and the end is often even worse than an experience in a court of bankruptcy."

■ In the light of the foregoing principles, it is manifest that a proper consideration of the earning power of the Debtor,

708

both before and subsequent to the filing of the petition for reorganization, will not warrant the determination of a value for the Debtor's property in excess of the maximum value of $3,575,000 determined by the Commission.

The average annual earnings available for fixed charges for the period from 1928 to 1939 inclusive were $9,761.33; and this sum, capitalized at 5%, would produce a valuation of only $195,233.59. Such average annual earnings for the years 1936 to 1939 inclusive, a relatively prosperous period for the Debtor, were $24,192; and this sum, capitalized at 5%, would produce a valuation of $483,840. In 1929 which, except for the current war period, appears to have been the most prosperous year in the history of the Debtor, the earnings available for fixed charges were $117,818; and if this sum were capitalized at 5% the valuation would be $2,356,360. During the last fourteen years, from 1928, the first year in which the Debtor operated in Mobile, through 1941, the Debtor's average earnings were slightly less than $30,000 a year. Thus, it is only by giving great weight to the hope of increased earnings in the future and to the actual investment in the Debtor's property that a value approximating the Commission's maximum figure of $3,575,000 can be determined. It is true that in recent months the earnings of the Debtor have increased substantially; but it also is true that these increased earnings have resulted in a large part from abnormal conditions arising out of the present national emergency and cannot, without considerable adjustment, be regarded as any guide for the future. The testimony given by the Debtor's Trustee at the hearing before this Court on May 11, 1942, clearly shows that a substantial portion of the Debtor's freight revenue during recent months has been derived from essential war materials which carry a high freight rate, and that the Debtor's income statements do not reflect deductions that will have to be made for income taxes which are now being imposed in ever increasing amounts; nor do said income statements fully reflect the additional expense that is bound to result from replacements and repairs made necessary by the wear and tear resulting to the Debtor's property from the tremendous increase in fast moving freight.

With respect to the Debtor's earnings for 1941, which were before the Commission at the time it rendered the supplemental report of March 3, 1942, the Commission in its supplemental report says:

"Although the Debtor's operating records show a recent increase in revenues, we are of the view that present earnings should not be the only factor considered in determining the capitalization of the reorganized Company, but that past experience during a long period of years, when the earnings were smaller, should also be considered, as well as the prospects of future years after the present emergency has passed. On the whole, it is our conclusion, and we find that the Debtor cannot be expected to earn in normal years in excess of approximately $185,000 for payment of interest. The prospective annual average of such earnings we find would be somewhat less than that. Considering all of the factors, we are of the view that the value of the property for the purpose of this proceeding is not in excess of $3,575,000, the amount heretofore fixed as the capitalization of the reorganized Company."

This Court now has before it as a part of the record in these proceedings the Debtor's Income Statement for 1941 together with its monthly Income Statements for the first three months of 1942. In determining that the value of the Debtor's property for the purpose of this proceeding does not exceed the maximum value determined by the Commission, I have given due consideration to the Debtor's earnings during 1941 and the first three months of 1942, together with all other relevant factors affecting the value of the Debtor's properties.

The abnormal earnings incident to the prosecution of war on an unprecedented scale should no more be deemed a proper criterion for estimating earning power under normal conditions than the depression years of 1932, 1933, 1934, 1935 and 1938, during which the Debtor had operating losses ranging from $37,256 to $105,794.

■ The General Mortgage Trustees' objections to the treatment proposed for the Reconstruction Finance Corporation, to the amount of new First Mortgage Bonds, and to the effective date of the Plan, also are untenable.

The contention that the General Mortgage Bondholders have been prevented by these features of the Plan from participating in the reorganization is apparently based upon the assumption that the new securities to be issued are sufficient to pay in full all those who have prior equities and hence that if

these factors were eliminated, the General Mortgage Bondholders could participate in the reorganization. The holders of the Prior Lien Bonds however, will not be made whole. The Prior Lien Bondholders will receive an inferior grade of securities in that the new securities are less adequately secured, the interest rate has been reduced, a contingent rate has been substituted for a fixed one, the maturities have been extended and the former strategic position has been weakened. Also the face amount of the new Second Mortgage Bonds to be issued to the Prior Lien Bondholders is only half of the amount owing for principal and accrued interest, and the common stock which is to be issued for the balance of the amount due is of uncertain value.

These rights, which will be lost, are of value. Consolidated Rock Products Company v. Du Bois, supra. Under the absolute priority rule recognized in Case v. Los Angeles Lumber Products Company, supra, and in Northern Pacific Railway Company v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, no value can be recognized for the interest of the General Mortgage Bondholders until the holders of prior equities have been compensated in full.

·The contention of the General Mortgage Trustees that the effective date of the Plan should be fixed at an earlier date, and that the value of the securities proposed to be issued for accrued interest during reorganization should be awarded to the General Mortgage Bondholders, is clearly inequitable and contrary to the principles enunciated in the above cited Supreme Court cases. This contention disregards the fact that under the Prior Lien Mortgage accrued interest on bonds is secured equally with principal and is entitled to the same priority as principal. It also disregards the fact that if the effective date were set back, the Debtor would have to pay a large amount of accrued interest on the new bonds, and this would require an increase in the amount of new money to be borrowed by the issuance of First Mortgage Bonds. The General Mortgage Trustees ask that the Debtor's most recent earnings be used as the basis for determining the value of the Debtor's properties, and in the same breath, ask this Court to make the Plan effective as of an earlier date than January 1, 1942, so that earnings which would otherwise enure to the benefit of the Prior Lien Bondholders, whose equity is superior to that of the General Mortgage

Bondholders, may be passed on to the General Mortgage Bondholders. There is no magic in the effective date of a plan of reorganization. It should be fixed at a date as close to the expected date of reorganization as the cash position of the Debtor requires or will permit. The Plan has to be feasible, and in this case the effective date of January 1, 1942, was required as a practical matter of feasibility, as well as by the element of fairness to the holders of the Prior Lien securities.

The General Mortgage Trustees' contention with respect to the treatment of Reconstruction Finance Corporation's claim is equally unsound. The note of the Debtor held by Reconstruction Finance Corporation has been in default since 1936. At any time during that period Reconstruction Finance Corporation, with the approval of this Court, could have exercised its legal right to foreclose on the $515,000 of the Debtor's Prior Lien Bonds pledged as collateral to its note. In fairness to the Debtor and to other creditors, Reconstruction Finance Corporation has refrained from exercising said right. If this Court should now upset the Plan, Reconstruction Finance Corporation could still exercise said right. As a result Reconstruction Finance Corporation would receive outright the reorganization equivalents of its present collateral.

The General Mortgage Trustees' contention that provision should be made for restoration to the General Mortgage Bondholders of the equity in the Finance Corporation's new collateral in the event of payment of the Finance Corporation's new note is fully answered by the Commission in its report of March 3, 1942, as follows:

"Should circumstances permit retirement of the new Reconstruction Finance Corporation note out of earnings of the new Company, such retirement could only take place through the sacrifice of earnings by the new stockholders. Such sacrifice cannot create a value in the interest of the General Mortgage Bondholders which should be recognized either now or later".

It might also be added that if there were an equity in the Prior Lien Bonds now pledged to the note held by Reconstruction Finance Corporation, such equity would belong to the Railroad Credit Corporation which has a second lien on the Prior Lien Bonds pledged as security for said note. But there is no equity in the $515,000 of

710

pledged bonds which are now selling at not over 27 flat.

All of the objections to the Plan of Reorganization and claims for equitable treatment filed herein should be and are hereby overruled and denied.

 The Commission has found in its report and order of June 25, 1941, affirmed in its supplemental report of March 3, 1942, that the equity of the Debtor's preferred and common stockholders at the time of said finding by the Commission had no value; that the interests or claims of the Debtor's General Mortgage Bondholders and general unsecured creditors (who would not have been entitled to priority if a receiver in equity of the property of the Debtor had been appointed by a Federal Court on the day of the approval of the original petition in this proceeding) had no value; that the Railroad Credit Corporation's second lien on the collateral held by Reconstruction Finance Corporation had no value at said time, and that the value of the interest or claim of said Railroad Credit Corporation is limited to the Debtor's distributive share in the marshaling and distributing fund of the Railroad Credit Corporation. I hereby affirm said findings of the Commission and further find that the equity of said preferred and common stockholders and the interests or claims of said General Mortgage Bondholders and said general unsecured creditors now have no value, that said Railroad Credit Corporation's second lien on the collateral held by the Reconstruction Finance Corporation now has no value, and that the value of the claim or interest of said Railroad Credit Corporation is limited to the value of the Debtor's distributive share in the marshaling and distributing fund of the Railroad Credit Corporation which is to be assigned to it.

The Commission has further found that certain classes of creditors enumerated in its order (which I shall not repeat) are not materially or adversely affected by the Plan. I have reviewed this finding and believe that it is correct, and hereby affirm the same. Under the provisions of Section 77, submission of the Plan to such classes of creditors and stockholders is not required.

The only classes of creditors to which the Plan must be submitted are the Debtor's Prior Lien Bondholders, Reconstruction Finance Corporation, and the Treasury Department of the United States.

The modified Plan of Reorganization of the Alabama, Tennessee & Northern Railroad Corporation as approved and certified to this Court by the Interstate Commerce Commission is hereby approved.